Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| JUAN J. RIGAU SEPÚLVEDA h/n/c JUAN J. RIGAU & ASSOCIATES; JUAN J. RIGAU & ASSOCIATES, INC.<br><br>Apelados<br><br>v.<br><br>AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS<br><br>Apelante | KLAN202400879 | APELACIÓN Procedente del Tribunal de Primera Instancia, Sala<br><br>Caso Núm.: K PE1999-2306<br><br>Sobre: *Injuction* |

Panel integrado por su presidenta, la Juez Brignoni Mártir, la Jueza Álvarez Esnard y la Jueza Prats Palerm

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 21 de marzo de 2025.

Comparece ante nos la Autoridad de Acueductos y Alcantarillados ("AAA" o "la Apelante") mediante escrito intitulado *Alegato de la Parte Demandada-Apelante* recibido el 30 de septiembre de 2024. Nos solicita la AAA que revoquemos la *Sentencia Parcial* emitida el 6 de septiembre de 2006, notificada el 11 de septiembre de 2006, y la *Sentencia* emitida el 10 de julio de 2024 y notificada el 12 de julio del mismo año, por el Tribunal de Primera Instancia, Sala Superior de San Juan ("foro primario" o "foro *a quo*"). Por virtud del dictamen notificado en el año 2006, el foro primario concluyó que existía responsabilidad de la AAA en la modalidad de culpa *in contrahendo*, durante el proceso de negociaciones de un Request For Proposal ("RFP"). De la misma forma, mediante el dictamen notificado en julio de 2024, el foro primario resolvió que la AAA debía resarcir al Sr. Juan Rigau Sepúlveda h/n/c Juan J. Rigau & Asociados (en conjunto, "señor Rigau" o el "Apelado") la cuantía de $561,150.23 por concepto de

Número Identificador

SEN(RES)2025_____

daños precontractuales por los gastos incurridos por el Apelado durante la fase precontractual entre enero de 1997 hasta diciembre de 1998. En reconsideración, dicha suma fue posteriormente reducida por el foro primario a $551,150.23, tras enmendar la cantidad acreditada por la suma pagada por Professional Services Group Inc., ("PSG") en una transacción parcial con el Apelado a $60,000.00.[1]

Por los fundamentos expuestos a continuación, **revocamos** la *Sentencia* apelada.

## I.

La génesis de la controversia que nos ocupa tiene su origen el 24 de agosto de 1999, cuando el Apelado instó *Demanda* sobre sentencia declaratoria e *injunction* provisional y permanente contra la AAA, Profesional Services Group ("PSG") y otros demandados de nombre desconocido.[2] Alegó que el Apelado era el creador y propietario de un programa integrado de gerencia computarizada, el cual facilitaba el mejoramiento institucional de la práctica de mantenimiento y entre otras funciones, aumentaba la capacidad de tratamiento de aguas. Explicó que desde el 1980, este había rendido exitosamente sus servicios profesionales tanto a la AAA como a otras empresas. Destacó que la capacidad y funcionalidad de sus servicios habían sido comprobados por la AAA y PSG en el 1995. En armonía con lo anterior, adujo que para el 1996, la AAA comenzó un proceso de reorganización y transición hacia la privatización con PSG. El Apelado arguyó que, como parte de este proceso, se publicó en un diario de circulación general, una solicitud de cualificaciones e invitación para someter propuestas de participación en un proceso de subasta pública, el cual tenía como propósito adquirir un Sistema Computarizado de Gerencia de

---

[1] *Véase,* Apéndice de la Apelación, págs. 16-20.
[2] *Íd.,* págs. 76-84.

Mantenimiento ("CMMS", por sus siglas en inglés"). Abundó que esto tenía como propósito la configuración, instrumentación, manejo, operación y control de la gerencia de los activos de la AAA.

En su Demanda, el señor Rigau sostuvo que, el 12 de abril de 1996, presentó una propuesta, así como todos los documentos necesarios conforme a las especificaciones y requerimientos que exigía la convocatoria para participar en el proceso de licitación. Expuso que, una vez sometido los documentos, el Comité Técnico de Evaluación de Propuestas de la AAA y PSG rindieron un informe favorable al Apelado y, posteriormente, funcionarios a nivel ejecutivo y miembros del comité evaluador informaron que el señor Rigau había sido la compañía favorecida para implantar el CMMS. Siendo ello así, el Apelado agregó que, a partir de agosto de 1996 hasta diciembre de 1998, las partes estuvieron involucradas en una serie de negociaciones dirigidas a la adquisición e implantación del CMMS. Recalcó el señor Rigau que simultáneamente, le requirió a la AAA que formalizara la firma del contrato previamente redactado conforme a la propuestas y negociaciones entre las partes, pero esto nunca se concretó.

Por otra parte, se desprende de la *Demanda* que, en diciembre de 1998, las partes sostuvieron una reunión en la cual se informó que la AAA estaba en vías de firmar un nuevo contrato con PSG y que esto extendía los servicios, responsabilidades y cambiaba el nombre de PSG al de Compañía de Aguas de Puerto Rico. Argumentó que, dado a esto, el Director de Servicios Técnicos de PSG requería preparar una nueva propuesta de solicitud de servicios y, ante este escenario, era necesario obtener nuevas cotizaciones de aquellos licitadores que participaron en el proceso de subasta original para la implementación del CMMS. Rigau relató que el 22 de julio de 1999, fue notificado de que se le estaba solicitando presentar una propuesta para implementar el CMMS

para seis (6) plantas de tratamiento de la AAA, lo cual requería licitar nuevamente el proyecto con otras compañías. Esbozó que, el 13 de agosto de 1999, el Apelado suscribió una misiva dirigida al entonces Director de la División Técnica y Cumplimiento de la Compañía de Aguas de Puerto Rico, en la cual apuntó al hecho de que el documento que se le había remitido, el cual consistía la propuesta para implantar un CMMS en las seis (6) plantas de tratamiento, guardaba identidad con el proyecto original de subasta. Por tal motivo, manifestó su desacuerdo en volver a participar en el proceso, toda vez que ya el mismo se completó y se obtuvo una recomendación favorable del Comité Técnico de Evaluación de Propuestas en el 1996. Señaló que finalizó la aludida carta solicitando fecha para la implementación del CMMS.

Ante este cuadro fáctico, el Apelado solicitó al foro primario que se expidiera un entredicho provisional, el cual ordenara a la Apelante a cesar y desistir la privación al señor Rigau de proceder con la implementación del CMMS en las plantas de tratamiento de la AAA conforme al proceso de subasta celebrado en 1996.

En respuesta, el 28 de septiembre de 1999, la AAA presentó *Contestación a Demanda.*[3] En esta, afirmó que las personas que someten propuestas para contratos con agencias del gobierno asumen el riesgo de que dicha agencia decida cancelar el proceso antes de otorgar el contrato y que estas tenían discreción en la adjudicación de subasta conforme los mejores intereses del Estado. Subsiguientemente, el 3 de julio de 2000, el señor Rigau instó ***Demanda Enmendada.***[4] En esencia, esgrimió que en el caso de epígrafe se estableció un vínculo contractual cuyo quebrantamiento constituyó un acto ilícito que conllevaba su reparación. En ese sentido, solicitó la indemnización por daños y

---

[3] *Íd.,* págs. 85-88.
[4] *Íd.,* págs. 89-94.

perjuicios, los cuales estimó en seis millones de dólares ($6,000,000.00). Además, solicitó indemnización por daños económicos estimados en dos millones de dólares ($2,000,000.00) al rechazar otros proyectos, ya que se le había informado sobre la adjudicación del contrato para la implementación del CMMS. De igual manera solicitó el pago de gastos en la ejecución del contrato en un millón de dólares ($1,000,000.00).

En respuesta, el 31 de agosto de 2000, el Apelante presentó *Contestación a Demanda Enmendada,* en la cual negó ciertas alegaciones y levantó sus correspondientes defensas afirmativas.[5] Tiempo después, tras llevarse a cabo el descubrimiento de prueba y haberse presentado el informe de conferencia entre abogados,[6] se celebró vista en su fondo sobre la fase de responsabilidad desde el 21 de septiembre hasta el 5 de diciembre de 2005.[7] Conforme surge del expediente, **la vista en su fondo se llevó a cabo únicamente a los fines de determinar si hubo responsabilidad civil por parte de la Apelante**.[8]

Una vez concluida la vista, y tras someterse la prueba por las partes, el **6 de septiembre de 2006**, el foro primario emitió ***Sentencia Parcial***.[9] Mediante esta, el TPI formuló las determinaciones de hechos que se transcriben a continuación:

1. El 25 de noviembre de 1991, la United States Enviromental Protection Agency (en adelante EPA) firmó un "Memorandum of Agreement" con la AAA. En dicho acuerdo, se le exigía a la Autoridad de Acueductos y Alcantarillados (en adelante AAA) el cumplimiento de dos fases. La primera fase debía implementarse en un término no mayor de tres (3) años desde la firma del "Memorandum of Agreement" y consistía en la actualización de los sistemas de cobro, finanzas, recursos humanos y administración de la AAA la segunda fase debía implementarse en un término no mayor de seis (6) años desde la firma del "Memorandum of Agreement" y consistía en la instalación de un sistema de mantenimiento preventivo en las plantas para, de esta forma, mejorar las plantas de

---

[5] *Íd.,* págs. 95-99.
[6] *Íd.,* págs. 100-139.
[7] *Íd.,* págs. 140-727.
[8] *Íd.*
[9] *Íd.,* págs. 47-75.

mantenimiento. El decreto entre la AAA y la EPA duraría desde el año 1991 hasta el 1997.

2. En el año 1993, el gobernador Pedro Roselló González designó un grupo de trabajo con la encomienda de producir opciones y soluciones viables a la rehabilitación del sistema de acueductos y alcantarillados. Este grupo de trabajo designado por el Gobernador rindió un informe en el que, entre otras cosas, recomendó declarar a la AAA en un estado de emergencia y solicitó la implementación de un programa de mantenimiento regular y preventivo.

3. Como la AAA estaba en estado de emergencia se le indicó a Rigau que se podía obviar el procedimiento formal de subasta.

4. En todo momento se le indicó a Rigau que la AAA estaba en estado de emergencia.

5. El 1 de septiembre de 1995, la compañía PSG comenzó a operar un contrato de mantenimiento, operación y administración de ciertas facilidades y equipo de la AAA. Este contrato sufrió dos enmiendas: la primera el 15 de septiembre de 1998 y la segunda el 1 de marzo de 1999. El contrato venció el 30 de junio de 2002.

6. **En noviembre de 1994 la AAA emitió un Request for Qualifications (RFQ) para evaluar el impacto y sus correspondientes beneficios en la posible adquisición de un Work Management System para la corporación pública**.

7. De este proceso de RFQ surgieron las siguientes empresas: Tenera Corp., The Systems Work, Inc., Mincom Intl., Hansen Information Techonologies, Inc., IBM y Severn Trent Intl.

8. En el año 1994 Rigau tiene su primera interacción con PSG, cuando él se comunica con el Sr. Mike Stompe, Presidente de PSG, y éste le indica que se comunique con el Sr. James Columbo (en adelante Sr. Columbo), Vicepresidente de Operaciones de PSG.

9. Rigau se reúne con el Sr. Columbo, la primera semana de agosto de 1994, y éste le indica que le va a coordinar una reunión con el Sr. John Nelson (en adelante Sr. Nelson), Director de Mantenimiento (superintendente) de Professional Services Group (en adelante PSG).

10. En esta reunión estuvo presente el Sr. Leopoldo García Viera (en adelante Sr. García).

11. Luego se reúne con el Sr. Nelson y el Ing. José Calderón (en adelante Ing. Calderón), Director de Logística y Mantenimiento de PSG, en la oficina del Sr. Nelson en Puerto Nuevo y le explica su programa de Sistema Computadorizado de Gerencia de Mantenimiento (en adelante CMMS).

12. En septiembre de 1994 Rigau se reúne con el Sr. Nelson, Ing. Calderón, Sr. Leopoldo García (empleado de Rigau), Sr. Ferry Widerman (consultor de Rigau) y un empleado de PSG de Canadá. Dicha reunión se lleva a cabo en las oficinas del Sr. Nelson en Puerto Nuevo. En la misma Rigau y su personal le hacen una presentación de su producto de gerencia en mantenimiento.

13. En esta reunión también estuvo presente el Sr. García.

14. **Como resultado de esa reunión el Sr. Nelson le solicita una propuesta a Rigau y le inquiere sobre su**

**disposición a instalar el sistema a su cuenta y riesgo en la planta de Barceloneta**.

15. **Rigau le somete su propuesta al Sr. Nelson, pero este le indica que no había necesidad de considerarla, en este momento, porque se iba a hacer el proyecto piloto en Barceloneta**.

16. En 1994 se instalaron dos (2) licencias del producto en Argos en la planta de Barceloneta.

17. **Esta instalación se realizó como un proyecto piloto a cuenta y cargo de Rigau.**

18. Al personal de Barceloneta – de AAA y de PSG – se le entrenó para trabajar con Argos.

19. **El proyecto piloto estuvo vigente desde diciembre de 1994 a diciembre de 1995.**

20. **El Sr. Nelson le expresó – de manera verbal – a Rigau que le proyecto piloto había sido exitoso y le solicitó una propuesta para toda la isla.**

21. **Eventualmente, después del haber sido instalado y probado durante el año piloto, PSG le emite un cheque a Rigau por $2,400.00 por concepto de las dos (2) licencias instaladas en Barceloneta. El cheque tiene fecha de 1 de noviembre de 1996.**

22. Para desembolsar ese dinero no fue necesario una subasta.

23. **Rigau somete al Sr. Nelson la propuesta que le solicitará**.

24. **El Sr. Nelson le indica que era mucho dinero, que la AAA tenía que aprobarlo y que el Ing. Calderón le dijo que iba a hacer una subasta.**

25. El **15 de marzo de 1996**, la **AAA emitió el** *Request for Proporsal.*

26. **Este RFP se le remitió a las firmas seleccionadas en el RFQ y a Juan J. Rigau & Asociados.**

27. **Rigau fue cualificado para esa subasta por el éxito del proyecto piloto llevado a cabo en Barceloneta**.

28. Este proceso no conllevo la celebración de una subasta formal.

29. **Se emitieron dos (2) Request for Proporsal (en adelante RFP).**

30. **Uno era para la contratación de un CMMS y otro para la contratación de un "Work Order System" (en adelante WOS).**

31. **Esta licitación era para la compra del producto "islandwide" (para toda la isla).**

32. Un CMMS es un sistema de gerencia y mantenimiento; mientras que un WOS sirve para la reparación y mantenimiento de distribución de agua.

33. **El 12 de abril de 1996 la parte demandante sometió una propuesta a dicha agencia**.

34. **La propuesta de Rigau incluía una propuesta para ambos RFP**.

35. **El 12 de abril de 1996 las demás firmas invitadas a participar, también, sometieron propuestas**.

36. El RFP es el documento que regiría como se llevarían a cabo los procesos para la negociación, compra e implementación del sistema denominado Sistema

Computadorizado de Gerencia de Mantenimiento (CMMS).

37. El RFP requería que la primera fase fuese la **implementación del CMMS en la planta de tratamiento de Barceloneta. El contratista estaba obligado a instalar el sistema de Barceloneta como un plan piloto utilizando la data actual. El contratista que trabajara satisfactoriamente en esta prueba de ambiente para un periodo específico de tiempo tenía asegurado el contrato final.**

38. **Rigau cumplió satisfactoriamente con el plan piloto en Barceloneta**.

39. Rigau había cumplido con la primera fase de la implementación del CMMS en la isla.

**40. Conforme al RFP se constituyó un comité evaluador compuesto por representantes de AAA y PSG para que evaluarán las propuestas sometidas por los licitadores.**

41. Este comité tenía la encomienda de hacer una evaluación y rendir un informe. El referido informe le sería sometido a la Junta de Subastas de la AAA. En su evaluación el comité tomaría en cuenta los criterios establecidos en la sección D del "Puerto Rico Aqueduct and Sewer Authority – CMMS Request for Proposal (March 1996)".

42. El presidente del Comité Evaluador era el Ing. José A. Calderón, funcionario de PSG. **El 18 de abril de 1996 se reunió por primera vez el comité evaluador**.

**43. A base de un criterio preliminar, el comité seleccionó a las siguientes firmas para que le dieran al comité una presentación completa de sus propuestas, a saber: Hansen Information Technologies, Inc., Juan J. Rigau & Asociados, The System Work, Inc. e IBM.**

44. El costo de las propuestas sometidas era de: $1,409,340.00 para Severns Trent International; $2,903,338.20 para Juan J. Rigau & Associates; $2,628,260.00, para Hansen Information Technologies; $1,487,556.00 para T.S.W. International y $6,388,201.00 para IBM.

45. A Rigau lo invitaron a realizar una presentación de su propuesta.

46. Las presentaciones de estas empresas se realizaron entre el 9 de mayo de 1996 y el 21 de junio de 1996.

47. El 9 de mayo de 1996 Juan J. Rigau & Asociados le hizo una presentación de su propuesta al comité evaluador.

48. El grupo de Rigau estuvo toda la tarde contestando los cinco (5) puntos mencionados en la carta remitida por el Ing. Calderón de 30 de abril de 1996.

**49. El 16 de agosto de 1996 el comité evaluador rindió su informe, titulado "Final Report: Evaluation of Proposed Computerized Work Order & Sewer Authority".**

50. **La página cuatro (4) del referido informe indica que el Comité Evaluador recomendaría un software de los propuestos que provea todas las capacidades de mantenimiento y sea simple para utilizar. Una vez la selección estuviera hecha, el Comité debe reportar su recomendación al Director Ejecutivo de PRASA en**

**orden para comenzar las negociaciones para la ejecución del contrato de los sistemas escogidos**.

51. **En las páginas 14 a la 17 se incluyen las conclusiones del Comité con respecto a cada licitador.**

52. El producto de The System Work (en adelante TSW) es muy bueno, pero su implementación en la AAA es muy riesgosa por las fallas que podría provocar su complejidad para el usuario.

53. La propuesta de Hansen Information Technologies, Inc. (en adelante Hansen) incluye la solución más completa para el WOS. Sin embargo, no tiene un CMMS. Hansen ofreció modificarlo, pero la política del Comité es no confiar en modificaciones de oferta hasta que la misma este desarrollada.

54. La propuesta de IBM incluye el CMMS más comprensible combinándolo con el "user friendly. Sin embargo, el costo propuesto es excesivamente alto y podría no ser el mejor interés de la AAA.

55. **Por último, con respecto al producto de Rigau, el informe indica, en la página 14, que Argos 2002 es un "software package" muy bueno y "user friendly". El propuesto es razonable considerando los servicios ofrecidos**.

56. De la misma forma, la página 13 del Informe expresa que los costos finales serán determinados después de que las negociaciones con el vendedor seleccionado hayan sido completadas.

57. **La parte seis del Informe incluye un listado de las posibles recomendaciones para la selección para la selección final [sic] por parte de AAA.**

58. **Las posibles soluciones son las siguientes:**
    a. **Hansen Information Technoligies - $2,627,260.000**
    b. **Hansen Information Technologies & Juan J. Rigau Assoc. - $5,530,598.00**
    c. **Hansen Information Technologies & IBM - $8,765,461.00**
    d. **IBM - $6,388,201.00**

59. **Rigau obtuvo copia de dicho informe porque el Ing. Calderón se lo entregó aproximadamente en febrero de 1998.**

60. El Ing. Calderón se lo entregó porque Rigau lo necesitaba para la implementación del sistema; porque ya había pasado la reunión con el Ing. Benjamín Pomales.

61. **Durante el año 1997, y mientras se llevaban a cabo las negociaciones entre Rigau, AAA y PSG, PSG le compra a Rigau Argos 2000 para Caguas, Comerío y Corozal.**

62. **En diciembre del 2006 le compran la aplicación de Argos 2000 para Caguas y Comerío.**

63. **PSG le pagó a Rigau por esas aplicaciones.**

64. **Para realizar dicha compra no se realizó ningún tipo de subasta o licitación.**

65. Para desembolsar ese dinero no fue necesario una subasta.

66. Funcionarios de PSG le indicaron a Rigau que el costo de esas aplicaciones le sería restado de la orden de compra que se hiciera para la aplicación a nivel Isla.

**67. Esas compras fomentaron la creencia de Rigau de que tenía el contrato "islandwide".**

68. Juan J. Rigau & Asociados se reunió en varias ocasiones con el personal de AAA y de PSG.

69. En varias ocasiones participó de esas reuniones el Sr. Leopoldo García Viera.

70. En varias ocasiones participó de esas reuniones el Ing. Roberto Santos.

71. Durante el año 1997 Rigau se reunió con el Sr. Orlando Colón (Director auxiliar para la gerencia y ambiente de AAA) por lo menos una vez cada dos (2) semanas.

72. Durante el año 1997 Rigau se reunió con el Ing. Calderón por lo menos una vez al mes.

73. La primera ocasión que se reunión con el Sr. Orlando Colón estuvo acompañado del Sr. Leopoldo García Viera.

74. La mayoría de las reuniones que sostenía Rigau era sólo con el Sr. Orlando Colón en la oficina del Sr. Colón (piso 10).

75. A principios de 1997 (mediados de febrero) Rigau se reúne con el Sr. Orlando Colón y le hace una presentación.

76. En esta reunión el Sr. Colón le indica a Rigau que están esperando que PSG este listo para comenzar con el proyecto. Le indicó que no se podía comenzar con el proyecto por dos (2) razones:

    a. Se iban a consolidar setecientas (700) personas. No se sabía si a las personas que ellos le darían el adiestramiento iban a estar disponibles después.

    b. Había un caso que podía ir al Tribunal entre PSG y "Severn Trent". Le indicó que hasta que no resolviera ese lio no se podía comenzar la implantación del producto de Rigau.

77. En ese momento Rigau entendió que las razones dadas para retrasar la implementación del producto eran razonables.

78. En ese momento no se había cancelado la subasta, lo que habían era posposiciones de la fecha de inicio del proyecto.

79. El 15 de noviembre de 1997, Rigau se reúne con el Ing. Benjamín Pomales, Director Ejecutivo de la AAA.

80. Dicha reunión se llevó a cabo en el piso 10, en el salón de conferencias a las 2:00 pm.

81. En la misma estuvieron presentes: Rigau Sr. Leopoldo García (representante de ventas de Rigau), Ing. Benjamín Pomales, Sr. Orlando Colón y el director de sistemas de información que le respondía al Sr. Orlando Colón.

82. En dicha reunión se llevó a cabo una presentación del producto de Rigau para exponer lo concerniente al proyecto. Los presentes le hicieron varias preguntas a Rigau. La mayoría de las mismas iban dirigidas a cómo iba a trabajar con la unión. A lo cual Rigau le indicó que con ese "problema" ya habían trabajado en la planta de Barceloneta.

83. Durante la reunión el Ing. Pomales indica que ve el proyecto muy bien y que lo veía necesario para la AAA.

84. Al finalizar la presentación, el Ing. Pomales le da instrucciones al Sr. Orlando Colón para que comenzara el proyecto.

85. Rigau entendió por esas expresiones del Ing. Pomales que éste le dio su endoso total a la aplicación y al proyecto. En ese momento no le cabe la menor duda de que el proyecto era de él.

86. Aproximadamente el 31 de diciembre de 1997 el Ing. Pomales renunció a su puesto. Lo sustituye el Ing. Perfecto Ocasio.

87. Cuando el Ing. Ocasio llegó a la AAA, Rigau se comunica con el Sr. Orlando Colón para poner al tanto del proyecto al Ing. Ocasio le pide varios meses para que el Ing. Ocasio se familiarice con la AAA y con el proyecto y que él [Orlando] lo llamaría.

88. Después de esta comunicación entre Rigau y el Sr. Colón, el Ing. Calderón sostuvo una conversación con Rigau.

89. En dicha reunión el Ing. Calderón le indica a Rigau que había dos (2) opciones – con relación al contrato entre Rigau, PSG y AAA – que él lo redacte, lo cual tomaría varios meses, o que Rigau prepare un borrador y el Ing. Calderón lo pasaría para la firma.

90. **Rigau preparó el borrador del contrato a solicitud del Ing. Calderón**.

91. Dicho borrador de contrato le fue entregado al Ing. Calderón.

92. El Ing. Calderón se lo envía al Sr. Orlando Colón y éste a la división legal.

93. **Se le solicita, a Rigau, que cambie, al final del documento, la persona que va a firmar el contrato. Originalmente lo firmaría el Director Ejecutivo de la AAA y le solicitan que lo cambiará para la firma del Ing. Fernando Pina, Gerente General de PSG**.

94. Rigau entendió por la solicitud del contrato que ya se habían concluido todas las negociaciones y lo único que faltaba era firmar el contrato.

95. **Ni PSG ni AAA firmaron un contrato con J. Juan Rigau & Asociados.**

96. Durante la primera semana de agosto de 1998 Rigau se comunica vía telefónica con el Sr. Orlando Colón y éste le indica que le solicitó al Sr. Miguel Moral, director de sistemas de información de PSG, la fecha de inició (sic) del proyecto. Orlando le dice a Rigau que llame a Moral (español).

97. Anteriormente, en julio de 1998, el Ing. Vanagle – cuando llama a Rigau para solicitarle una propuesta para siete (7) plantas de tratamiento – le indica a Rigau que la persona encargada, en estos momentos, del proyecto "islandwide" era el Sr. Moral.

98. Cuando Rigau se comunica vía telefónica con el Sr. Moral, éste le solicita una reunión.

99. Durante esa misma primera semana de agosto, Rigau se reúne con el Sr. Moral y éste le indica que él conoce de sistemas de información, pero que de mantenimiento no conoce nada. Le indica que hay que coordinar una serie de reuniones para que Rigau se reúne con los directores

regionales, ya que él utilizaría el criterio de sus directores regionales.

100. Después de esas reuniones individuales, el Sr. Moral le indicó a Rigau, que se reunirían todos los directores regionales con Rigau y con él.

101. Los directores regionales y/o regiones eran los siguientes:

    a. Ing. José Calderón – región este (Caguas)

    b. Sr. Armando Barrow – región Arecibo

    c. Región Ponce

    d. Sr. Valdés – Región Metro

102. Con el primero que se reúne Rigau fue con el Sr. Armando Barrow.

103. El Sr. Barrow es funcionario de PSG.

104. La planta de Barceloneta correspondía a la región de Arecibo a cargo del Sr. Barrow.

105. La reunión con Rigau y el Sr. Barrow se llevó a cabo en la oficina de Barrow.

106. En la reunión estuvieron presentes, además de Rigau y del Sr. Barrow, una muchacha que estaba a cargo del proyecto y el supervisor de mantenimiento regional.

107. El Sr. Barrow estaba tan convencido con el proyecto que le indicó a Rigau que estaba dispuesto a utilizar sus fondos para financiar el proyecto en su región.

108. En la región de Ponce se reúne con el sub-director de la Región y éste le indica que "¿cuándo empezaba?"

109. En la región [sic] Metro, Rigau se reúne con el Sr. Valdes [sic] y a mitad de reunión se unió a la misma un español. Ambos apoyaban el proyecto.

110. Rigau no se reunió con el Ing. Calderón, porque cuando lo llamó para coordinar la reunión, el Ing. Calderón le indicó que él no tenía que reunirse con Rigau porque él estaba apoyando el proyecto. Inclusive, le indicó a Rigau que él quería que le proyecto comenzara por su región.

111. Después de estas reuniones con los directores regionales Rigau se reunió con todos ellos y el Sr. Miguel Moral en el séptimo piso del edificio central de AAA.

112. Dicha reunión debió efectuarse entre el 10 y el 15 de agosto de 1998.

113. En dicha reunión se encontraban presentes, además de Rigau y el Sr. Moral, las siguientes personas: Sr. Armando Barraw, Sr. Phillipot, un representante de cada región y el Sr. Leopoldo García.

114. En dicha reunión se discutió la estrategia de cómo se iba a montar el proyecto. Se comenzaría por Ponce y por Arecibo.

115. Todos los directores estaban preguntando cuándo se iba a implementar el programa Argos en las distintas regiones.

116. Después de esta reunión hubieron dos (2) reuniones posteriores. Una de ellas fue con el grupo de trabajo del área de servicios, en la cual estuvo presente el Sr. Phillipot, su ayudante, un muchacho de sistemas y el Sr. Miguel Moral.

117. El Sr. Phillpot le solicita a Rigau poner al día (actualizar) los "schedules" de ambos proyectos (CMMS y 301H).

118. Entre agosto y septiembre de 1998 Juan J. Rigau Asociados sometió una propuesta actualizada para el proyecto del CMMS.

119. El 1 de septiembre de 1998 Rigau presentó una actualización de su propuesta "Islandwide" (The Implementation of a CMMS for Improving Maintenance and Operational Reliability in Support of PRASA's Infrastructure, Customer Satisfaction and Quality of Service).

120. Se realizaron varias actualizaciones de esta propuesta de acuerdo a la información brindada por personal de PSG y AAA. Hubo varios cambios con relación al número de plantas a incluirse en la propuesta.

121. Según el Sr. Phillipot el proyecto se comenzaría el 2 de septiembre de 1998.

122. En una reunión posterior a la de agosto de 1998, la cual debió efectuarse entre el miércoles y jueves de la semana del 2 de septiembre de 1998, Rigau se reunió con el Sr. Miguel Moral. En dicha reunión éste le indicó que el proyecto no tenía prioridad en ese momento. Lo único que le pudo indicar es que él había sometido un informe favorable, pero no le podía indicar la razón de la falta de prioridad para su producto.

123. Paralelo a todo este proceso del contrato "islandwide", en julio de 1998 Rigau recibe una llamada del Ing. Mark Vanagle, persona que estaba a cargo de proyectos especiales de PSG.

124. El Ing. Vanagle le solicita a Rigau la preparación de una propuesta para siete (7) plantas de tratamiento primaria (las llamadas "301 H"). Este proyecto había que concluirlo para diciembre de 1998.

125. Dicha propuesta no se le solicitó a más ningún licitador, solamente a Rigau.

126. No se le solicitó a ninguna otra persona, porque no era lógico utilizar otro sistema si Argos era el que se utilizaría a nivel isla.

127. Originalmente el proyecto incluía siete (7) plantas de tratamiento primario, eventualmente le solicitaron que enmendará su propuesta para eliminar la planta de Mayagüez.

128. Dicha propuesta le fue sometida por Rigau con el carácter de urgencia que solicitaron.

129. El Sr. Vanagle le indica a Rigau – al éste entregarle la propuesta – que eso era justo lo que él quería, pero que le diera hasta el próximo día para analizarlo mejor.

130. Dicha propuesta incluía originalmente siete (7) plantas de tratamiento primario – luego se enmendó para eliminar la planta de Mayagüez y quedó reducida a seis (6) plantas – de la AAA. Era para asegurar el cumplimiento ambiental, porque en ese momento había varias plantas que no cumplían con la capacidad; operaban obre sus niveles, por lo que tenían problemas de incumplimiento con las descargas.

131. La eliminación de la planta de Mayagüez fue un cambio solicitado por el Sr. Vanagle.

132. Rigau le somete un cambio de varias páginas de la propuesta el 2 de agosto de 1998.

133. El 14 de agosto de 1998 somete la propuesta de las plantas 301 H actualizada (se eliminó la planta de Mayagüez).

134. Después de someterle esta propuesta al Sr. Vanagle, éste le pide a Rigau que prepare el contrato, porque este proyecto tenía que estar listo para diciembre de 1998.

135. Dicho borrador de contrato fue sometido por Rigau.

136. Después del huracán (Georges) Rigau llama a Phillipot y éste le solicita un tiempo y le indicó que él se comunicaba con Rigau cuando pasara la emergencia.

137. A la semana de esta comunicación (octubre de 1998), el Sr. Phillipot le solicita una reunión a Rigau. Esa reunión se llevó a cabo en octubre de 1998 en el piso siete (7) del edificio de la AAA y estuvieron presentes el Sr. Phillipot y Rigau.

138. En esa reunión Phillipot le solicita a Rigau que revisará la propuesta de las plantas 301H para añadirle el incinerador de Puerto Nuevo y las estaciones de bombeo de las plantas. Le indica que debía proceder con urgencia, ya que había que empezar el proyecto la próxima semana.

139. El Sr. Vanagle le indica, además, que someta un contrato con estas modificaciones.

140. Rigau somete esta propuesta y el contrato revisado.

141. Además, Rigau reitera su compromiso de comenzar inmediatamente.

142. El contrato estaba para ser firmado por Rigau y el Sr. Fernando Pina (PSG).

143. Al preparar estos contratos estaba seguro que los proyectos era de él.

144. La subasta del proyecto "islandwide" nunca fue cancelada.

145. Durante la semana del 2 de septiembre de 1998 Rigau somete unos "schedules" actualizados para ambos proyectos.

146. A finales de noviembre de 1998 Phillipot llama a Rigau y le dice que tiene que reunirse con él inmediatamente.

147. Dicha reunión se llevó a cabo el 9 de diciembre de 1998 en el salón de conferencias del séptimo piso del edificio central de la AAA.

148. En la referida reunión se encontraban presentes Rigau, Sr. James Columbo, Sr. Miguel Moral, ejecutivos principales del área de servicio técnico, cinco (5) personas del grupo de trabajo de Juan J. Rigau & Asoc. y el Sr. Jean Mark Phillopt.

149. Phillipot le pide a Rigau que presente la metodología del proyecto a todo el grupo de trabajo, porque había un nuevo director a cargo de la región Metro.

150. Al finalizar la reunión Phillipot le dice a Rigau que en las próximas semanas van hacer una nueva compañía, que ya no va a ser PSG sino Compañía de Aguas de Puerto Rico (en adelante CAPR).

151. Le indica el Sr. Phillopot que el contrato con CAPR requiere tres (3) licitadores y relicitar todos los nuevos contratos.

152. Rigau le pregunta a Phillipot que significan esas expresiones y él le indica que su proyecto tiene que volverse a subastarse.

153. Le indica, además, que James Columbo va a someter los documentos para la nueva licitación, porque él era el encargado del nuevo "request for proporsal". Tenía que tenerla disponible para el 4 de enero de 1999.

154. Rigau objeta la nueva subasta porque todos los detalles, el trabajo estaba en manos de los demás licitadores y cualquier licitador podía tomar su información y ponerla en sus propuestas sin la necesidad de perder los dos (2) años que llevaba Rigau negociando con la AAA y PSG.

155. El Sr. Miguel Moral le dice que se sentía sumamente avergonzado porque él entendía que esa reunión era para definir la fecha para comenzar el proyecto.

156. Después de la reunión, el lunes Rigau llama a James Columbo y le pregunta por la reunión. Columbo le indica que él estaba en la misma solamente como observador y que su única función era sacar el nuevo "request for proposal" para el 4 de enero de 1999.

157. Ante esta situación el 24 de diciembre de 1998 Rigau le remite una carta al Ing. Perfecto Ocasio explicándole toda la situación y los nuevos sucesos acaecidos.

158. L e envía copia de esta carta al Sr. Fernando Pina, Gerente General PSG, y a la Lic. Nilda Visepo.[10]

159. La carta explicaba que desde agosto de 1996 se le ha indicado repetida y consistentemente por oficiales de PSG y AAA a Rigau que son la empresa seleccionada para implantar el proyecto, y que sólo elementos no relacionados con el proyecto ocasionaron una postergación tras otra de la fecha de comienzo del mismo.

160. Como reacción de esta carta el 27 de diciembre de 1998 la Lic. Visepo llama a Rigau y le indica que refirió la carta a la Sra. Angie Nacer, Tesorera de la Junta de Gobierno, y ella se comunicaría con Rigau.

161. Rigau llama a la secretaria del Ing. Perfecto Ocasio el 28 de diciembre de 1998 y ella le indicó que el Ingeniero no se podía reunir con él.

162. La Sra. Angie Nater llamó a Rigau y le solicitó una reunión.

163. La reunión se llevó a cabo en enero de 1999 en la AAA y se encontraban presentes el Lic. Jorge Carazo, asesor de la Junta de Gobierno, la Lic. Letvia Arza, abogada de Rigau y Rigau.

164. En dicha reunión llevó la voz cantante el Lic. Carazo. Él pidió un recuento de todo lo que había motivado la carta del Rigau.

165. A los dos o tres el Lic. Carazo le remite una carta a la Lic. Arza donde le indica que AAA no tiene nada que ver con ese proyecto; que eso era problema de PSG.

166. En abril de 1999 Rigau llama a Phillipo – ya no era PSG sino CAPR – y le preguntó por el "request for proposal".

167. Phillipot le indica a Rigau que no van a hacer mantenimiento preventivo si su contrato no lo exigía. No van a hacer mantenimiento preventivo a menos que lo obliguen, porque no saben si le van a renovar el contrato.

---

[10] La determinación de hecho 158 fue transcrita según surge de la pág. 65 del Apéndice de la Apelación.

168. El contrato – entre PSG y AAA – de 1995 explícitamente requería mantenimiento preventivo. El contrato (la enmienda) de 1998 convertía el mantenimiento en discrecional.

169. Esas expresiones el Sr. Phillipot le hicieron pensar a Rigau que siempre habían estado jugando con él (desde 1998), porque ya AAA y PSG sabían que el mantenimiento se iba a convertir en discrecional y, por ende, no tenían la obligación de realizarlo.

170. Después de la enmienda de 1998 si PSG realizaba mantenimiento salía de su "service fee", es decir, del dinero de PSG.

171. Después de esta conversación con el Sr. Phillipot, Rigau pasa como mes y medio buscando a James Columbo.

172. En la primera semana de agosto de 1999 sale el nuevo "**request for proposal" donde pedían una nueva propuesta para las seis (6) plantas de tratamiento primario (301H) y se lo envían a Rigau**.

173. **Este nuevo "request for proposal" no incluía el proyecto "islandwide**".

174. **Al recibir este nuevo "request for proposal" Rigau prepara, con la Lic. Ivette Pérez, una comunicación expresando que entre este RFP y el anterior había identidad de propósito.**

175. **Rigau no somete la propuesta porque entendía que ellos podían rechazarla de plano y perdería todas las negociaciones.**

176. **En cambio decidió someter la carta indicando que había identidad de propósito.**

177. El Dr. Rigau le remite la referida carta Phillipot el 13 de agosto de 1999.

178. Al poco tiempo Rigau recibe una llamada del Lic. Carlos Onetti y Rigau le expusó (sic) al Licenciado lo de identidad de propósito.

179. El Lic. Onetti le indica a Rigau que él concurre con sus planteamientos.

180. Después de esta llamada del Lic. Onetti, Rigau se reunió con él, con la Lic. Ivette Pérez, con el Sr. Phillipot y con un francés que era el nuevo director de mantenimiento en el séptimo piso del edificio de la AAA.

181. Dicha reunión debió haberse efectuado a mediados de agosto de 1999.

182. En dicha reunión se discutió primero el proyecto 301H y luego el proyecto CMMS "islandwide". Se indicó – con respecto al "islandwide"- que se comenzaría en Carolina y después "piece meal", poco a poco se iría expandiendo por toda la Isla.

183. Rigau objeta estas expresiones por el dinero ya invertido.

184. En respuesta a lo discutido en esa reunión el Lic. Onetti le solicita a Rigau un detalle de los gastos incurridos por él en los pasados años.

185. Rigau le somete el referido detalle al Lic. Onetti a través de su abogada, Lic. Pérez.

186. Prontamente lo llamó el Lic. Onetti cancelando todo lo ya hablado y dando por terminado todas las negociaciones.

187. Al fin y al cabo no se hizo ni el proyecto CMMS "islandwide" ni el proyecto de las plantas de tratamiento primario (301H).

188. **Al día de hoy la AAA no ha tomado una determinación por escrito en cuanto a las recomendaciones contenidas en el informe sometido por el comité evaluador.**

189. **La AAA nunca presupuestó los fondos para el proyecto del CMMS**.

190. Rigau atribuye la falta de implantación de ambos proyectos a varias razones, a saber:

   a. Cambio sustancial de los requisitos contractuales entre el contrato de 1995 y la enmienda de 1998 – contrato entre AAA y PSG -, ya que la referida enmienda eliminaba la obligatoriedad de la implantación de un CMMS.

   b. El contrato de 1998 dejaba la puerta abierta para no amarrar ingresos; no tenía que cumplir con responsabilidades contractuales y aún así recibía ese ingreso (PSG). Si se hacía mantenimiento preventivo los fondos salían del "service fee".

191. **En todo se le dejó saber a Rigau que había una urgencia por implementar el CMMS debido al incumplimiento con la EPA.**

192. **Rigau a pesar de todos los sucesos continuaba reuniéndose y actualizando sus propuestas porque entendía que el proyecto era de él; que lo único que faltaba era determinar la fecha de inicio.**

193. **Rigau todo el tiempo negocio de buena fe con AAA y PSG.**

194. **Siempre le pedían a Rigau que estuviera preparado para comenzar en cualquier momento.**

195. **Nunca se canceló la subasta.**

196. **Nunca se le indicó que el contrato no era de ellos**.

197. Siempre le hicieron creer a Rigau que el contrato era de ellos.

198. Siempre se le dio a entender a Rigau que el contrato se iba a hacer, solamente se aplazaba la fecha de inicio.

199. **AAA y PSG no actuaron de buena fe durante las negociaciones**.

200. **AAA y PSG le crearon una falsa expectativa a Rigau de que el contrato era de él.**

201. **AAA y PSG no tenían la intención real de culminar las negociaciones con el otorgamiento del contrato y posterior implementación del sistema**.

202. **De Rigau haber conocido que AAA y PSG no tenían la intención de implementar el producto se hubiera retirado de las negociaciones mucho antes.**

203. Las siguientes actuaciones, además de todo lo antes mencionado, reafirmaron la expectativa del Rigau de que el proyecto era de él:

   a. Se adquiere el producto en dos (2) regiones para familiarizarse con el producto.

   b. En todas las reuniones le indicaban que ellos eran los escogidos.

   c. **Sentido de urgencia para hacer el proyecto.**

d. **Él asumió que las negociaciones eran de buena fe.**

e. **Las conversaciones con los grupos técnicos de la EPA explicándole el producto y el status de su implementación.**

f. **En ningún momento la primera enmienda (1998) estuvo disponible el público. Nunca llegó a la Oficina del Contralor. Sale pública dicha enmienda después del cambio de gobierno**.

   i. De haber leído dicha enmienda entendería que las prioridades cambiaron – cambio de obligatorio a discrecional la implantación del CMMS – y sus expectativas hubieran variado. Hubiera "frenado" antes las negociaciones.

g. En todo momento lo estimulaban a hacer el contrato y le daba razones para atrasar la fecha de inicio del proyecto.

h. Nunca hubo duda de que el proyecto se iba a llevar a cabo, lo único que variaba era la fecha de inicio del proyecto.

   i. Él nunca hubiera incurrido en tantos gastos si no le hubiera dado el contrato. Él no hubiera mantenido a su grupo técnico (14 personas) si no le hubieran dado el contrato. Esto es así porque el RFP decía que si había un cambio de personal tenía que notificarse a la AAA y a PSG.

**Cónsono con estas determinaciones de hechos, el foro primario concluyó que, conforme a la prueba desfilada, existían elementos para determinar que en este caso se configuró la doctrina de *culpa in contrahendo*. Resolvió el TPI que la AAA y PSG le hicieron creer al señor Rigau que se firmaría un contrato, creándole una falsa expectativa, pues estos no tenían intención real de otorgarlo. Por ende, el foro *a quo* dispuso que restaba celebrar una vista para entonces determinar el valor de los daños alegados.**

Inconforme con este resultado, el 3 de noviembre de 2006, la AAA presentó escrito intitulado *Escrito de Apelación* ante esta Curia.[11] Evaluado el recurso, el 22 de diciembre de 2006, un panel hermano emitió *Resolución.*[12] Por virtud de esta, **aclaró que la *Sentencia Parcial* dictada por el foro *a quo*, se trataba más**

---

[11] *Véase,* Apéndice de la Apelación, págs. 805-829.
[12] *Íd.,* págs. 836-842.

**bien de una resolución interlocutoria, ya que no constituía una adjudicación final del pleito. Por tal motivo, se acogió el recurso como un *certiorari* y se denegó su expedición.**

Una vez se retomados los trabajos a nivel del foro primario, el **27 de mayo de 2008**, la AAA presentó *Moción de Reconsideración a tenor con nueva Jurisprudencia del Tribunal Supremo y Enmienda a la Sentencia de Conformidad.*[13] En esta, argumentó que, en el presente caso, procedía la desestimación del pleito por falta de prueba. Enfatizó en el factor de que los contratos con el gobierno debían constar por escrito, ello según reiterado en cierta jurisprudencia publicada en aquella época.[14] Destacó que conforme a uno de estos casos, *Perfect Cleaning* v. *Cardiovascular*, 172 DPR 139 (2007), la mera participación en un proceso de subasta no confiere derechos y los entes gubernamentales tienen la discreción de adjudicar la subasta.[15] De igual manera, indicó la AAA que el señor Rigau nunca recibió una adjudicación formal  de la subasta, y al mismo tiempo, sostuvo que el Apelado tampoco se encontraba en *Good Standing* ya que no había entregado unos informes corporativos al Departamento de Estado. En tal sentido, razonó la AAA que el foro primario no debió concederle ningún remedio al señor Rigau ya que no tenía derecho a su reclamo y esbozó, además, que este carecía de legitimación activa para llevar la causa de acción en su carácter personal.

Por su parte, el 10 de noviembre de 2008, el Apelado presentó *Oposición a "Moción de Reconsideración a tenor con nueva Jurisprudencia del Tribunal Supremo y Enmienda a la Sentencia de Conformidad".*[16] Mediante este escrito, **el señor Rigau reiteró su postura en torno a que en este pleito no cabía hablar de**

---

[13] *Íd.,* págs. 843-888.
[14] *Íd.,* págs. 857-860.
[15] *Íd.,* págs. 862-863.
[16] *Íd.,* págs. 869-910.

**contrato alguno**, **pues aplicaba la doctrina de *culpa in contrahendo*.**

Ponderados los argumentos de las partes, el 3 de marzo de 2011, el foro primario emitió *Resolución*.[17] Allí determinó que ya había adjudicado que en la controversia de marras se había configurado la doctrina de *culpa in contrahendo*. Al mismo tiempo, resolvió que el señor Rigau Sepúlveda ostentaba legitimación activa para llevar el caso en su carácter personal. En desacuerdo, el 4 de abril de 2011, la Apelante presentó *Petición de Certiorari* para impugnar el proceder del foro primario.[18] Sin embargo, el 24 de junio de 2011, un panel hermano denegó expedir el recurso.[19] No empece a lo anterior, el 7 de octubre de 2011, la Apelante presentó *Petición de Certiorari* al Tribunal Supremo de Puerto Rico y el 20 de enero de 2012, el Alto Foro declaró *No Ha Lugar* dicho recurso.[20]

Conforme surge de los autos, posterior a este trámite apelativo, el 13 de julio de 2017, la AAA presentó *Moción en Cumplimiento de Orden Sometiendo Memorando de Derecho*.[21] En este escrito, elaboró sobre la doctrina de *culpa in contrahendo* y como esta aplicaba la presente controversia. Ese mismo día, el Apelado sometió *Memorando de Derecho*.[22] Mediante esta, esbozó su teoría del caso sobre el por qué procedía la acción en daños.

Así las cosas, el **6 de diciembre de 2017**, emitió ***Resolución y Orden***.[23] Por virtud de esta resolución y orden interlocutoria, el foro primario expuso que bajo la doctrina de *culpa in contrahendo* únicamente procedía recobrar los gastos relacionados con la fase preparatoria del acuerdo. A tenor con lo anterior, ordenó a las respectivas representaciones legales de las partes a que prepararan

---

[17] *Íd.,* págs. 911-930.
[18] *Íd.,* págs. 931-973.
[19] *Íd.,* págs. 974-988.
[20] *Íd.,* págs. 989-1041.
[21] *Íd.,* págs. 1042-1050.
[22] *Íd.,* págs. 1051-1062.
[23] *Íd.,* págs. 1065-1072.

un nuevo informe de conferencia con antelación a juicio que cumpliera con las Reglas 37.4 y 37.5 de Procedimiento Civil, *infra.* Asimismo, ordenó a los abogados a comparecer con toda la prueba que intentaran presentar en el juicio debidamente detallada y marcada en una carpeta y advirtió que aquella evidencia que no estuviera recopilada no sería permisible.

Esta determinación del foro primario fue impugnada ante este Tribunal de Apelaciones el 12 de febrero de 2018, cuando el Apelado presentó *Petición de Certiorari.*[24] Examinado el recurso, el 20 de marzo de 2018, un panel hermano dictó *Resolución* y denegó expedir el recurso interpuesto por el señor Rigau.[25] Así pues, el 3 de mayo de 2018, las partes presentaron *Informe Preliminar entre Abogados para la Conferencia con Antelación al Juicio sobre Daños Enmendado.*[26] En esta, las partes de epígrafe esbozaron sus respectivas teorías del caso más aquella prueba que pretendía presentar en el juicio en su fondo. Ulteriormente, el 20 de junio de 2023, el foro primario emitió *Sentencia Parcial* en la que desestimó con perjuicio la reclamación contra PSG, tras estos llegar a un acuerdo transaccional con el Apelado.[27]

Finalmente, los días 22, 24, 25 y 29 de enero de 2024 se celebró el juicio en su fondo en la fase de daños entre las partes de epígrafe.[28] Sometido el caso, y tras aquilatar la prueba ante su consideración, el **10 de julio de 2024**, el foro primario emitió *Sentencia* **notificada el 12 de julio de 2024**.[29] En esta**, acogió las doscientas tres (203) determinaciones de hechos que se incluyeron en la *Sentencia Parcial* emitida el 6 de septiembre de 2006 y, adicionalmente, incorporó veintidós (22)**

---

[24] *Íd.,* págs. 1064-1101.
[25] *Íd.,* págs. 1102-1110.
[26] *Íd.,* págs. 1111-1249.
[27] *Íd.,* págs. 1250.
[28] *Véase* Transcripción de las vistas del juicio sobre la fase de daños, celebradas el 22,24,25,26 y 29 de enero de 2024, Apéndice de la Apelación, pág. 1260-2119.
[29] *Íd.,* págs. 1-13.

**estipulaciones de hechos las cuales se transcriben a continuación:**

1. El 1 de septiembre de 1995 la compañía PSG comenzó a operar un contrato de mantenimiento, operación y administración de ciertas facilidades y equipo de la AAA. El contrato sufrió dos enmiendas: la primera, el 15 de septiembre de 1998 y la segunda, el 1 de marzo de 1999. El contrato venció el 30 de junio de 2002.

2. En noviembre de 1994 la AAA emitió un Request for Qualifications (RFQ) para evaluar el impacto y sus correspondientes beneficios en la posible adquisición de un "Work Management System' para la corporación pública.

3. De este proceso de RFQ surgieron las siguientes empresas: Tenera Corp., The Systems Works, Inc., Mincom IntL, Hansen Information Technologies, Inc., IBM y Severn Trent Intl.

4. El 15 de marzo de 1996, la AAA emitió el Request for Proposal' (RFP). El mencionado RFP es el documento que regiría cómo se llevarían a cabo los procesos para la negociación, compra, implementación del sistema denominado Sistema Computadorizado de Gerencia de Mantenimiento (CMMS).

5. Este RFP se les remitió a las firmas seleccionadas en el RFQ y a Juan J. Rigau & Asociados.

6. Este proceso no conllevó la celebración de una subasta formal.

7. El 12 de abril de 1996 la parte demandante sometió una propuesta a dicha agencia.

8. El 12 de abril de 1996 las demás firmas invitadas a participar también sometieron sus propuestas.

9. Conforme al RFP se constituyó un comité evaluador compuesto por representantes de AAA y PSG para que evaluaran las propuestas sometidas por los licitadores.

10. Este comité tenía la encomienda de hacer una evaluación y rendir un informe. El referido informe le sería sometido a la Junta de Subastas de la AAA. En su evaluación el comité tomaría en cuenta los criterios establecidos en la sección D del Exhibit 2 por estipulación.

11. El presidente del Comité Evaluador era el Ing. José A. Calderón, funcionario de PSG.

12. El 18 de abril de 1996 se reunió por primera vez el Comité Evaluador.

13. A base de un criterio preliminar, el comité seleccionó a las siguientes firmas para que le dieran una presentación formal de sus propuestas, a saber: Hansen Information Technologies, Inc., Juan J. Rigau & Asociados, The System Works, Inc. y IBM.

14. Las presentaciones de estas empresas se realizaron entre el 9 de mayo de1996 y el 21 de junio de 1996.

15. El 9 de mayo de 1996 Juan J. Rigau & Asociados le hicieron una presentación de su propuesta al Comité Evaluador.

16. El 16 de agosto de 1996 el Comité Evaluador rindió su informe titulado "Final Report: Evaluation of Proposed Computerized Work Order & Maintenance Management

Systems for the Puerto Rico Aqueduct & Sewer Authority"•

17. La parte seis del Exhibit 5 por estipulación incluye un listado de las posibles recomendaciones para la selección final por parte de la AAA.

18. Juan J. Rigau & Asociados nunca negoció con Hansen Information Technologies, Inc.

19. Al día de hoy la AAA no ha tomado una determinación por escrito en cuanto a las recomendaciones contenidas en el informe sometido por el Comité Evaluador.

20. Nunca se firmó contrato con Juan J. Rigau & Asociados. Juan J. Rigau & Asociados se reunió varias veces con personal de la AAA y de PSG.

21. Entre agosto y septiembre de 1998 Juan J. Rigau & Asociados sometió una propuesta actualizada para el proyecto del CMMS.

22. La AAA nunca presupuestó los fondos para el proyecto del CMMS.[30]

Cónsono con estas determinaciones de hechos, el foro primario resolvió que la AAA debía indemnizar al señor Rigau por la cantidad de quinientos sesenta y un ciento cincuenta mil dólares con veintitrés centavos ($561,150.23) por los gastos incurridos en la fase precontractual entre enero de 1997 hasta diciembre de 1998.

Inconforme, el 29 de julio de 2024, la Apelante presentó *Moción de Reconsideración y sobre Determinaciones Adicionales de Hechos y Conclusiones de Derecho de Conformidad con las Reglas 47 y 43.1 de Proc. Civil.*[31] Por medio de este escrito, argumentó que el foro primario debía reconsiderar la cuantía concedida por el foro *a quo* toda vez que la *Resolución* emitida por el propio tribunal el 6 de diciembre de 2017, establecía que la prueba a usar en el juicio debía ser solo aquella que demostrara algún **daño en la fase preparatoria del contrato**. Sostuvo que, en el juicio, se presentó evidencia de cheques y sobrepagos que se hicieron en la fase de ejecutoria de contrato y no en la fase de negociación.

Por otro lado, argumentó que el foro primario debía reconsiderar su determinación sobre la existencia de una

---

[30] *Íd.* págs. 6-7.
[31] *Íd.,* págs. 21-32.

expectativa real por parte de Rigau de que el contrato con la AAA se llevaría a cabo. De igual forma, esbozó que Rigau estaba impedido de firmar el contrato ya que este tenía una deuda con el Internal Revenue Service ("IRS"). Asimismo, sostuvo que el foro primario debió tomar en consideración un *grand* de Puerto Rico Industrial Development Company ("PRIDCO") valorado en quinientos mil dólares ($500,000.00) y deducirlo como un ingreso para el periodo comprendido entre enero de 1997 a diciembre de 1998. Por otra parte, objetó la credibilidad que le otorgó el foro primario al testimonio del señor Rigau Sepúlveda y el de su hija, la contable Irma Rigau en cuanto los gastos de nóminas, pagos y reembolsos a sus empleados. Finalmente, aclaró que la transacción entre el señor Rigau y PSG ascendía a sesenta mil dólares ($60,000.00) y no a cincuenta mil ($50,000.00).

Por su parte, el 16 de agosto de 2024, el señor Rigau presentó *Oposición a Moción de Reconsideración y sobre Determinaciones Adicionales de Hechos y Conclusiones de Derecho* mediante la cual insistió en su postura en cuanto a que la indemnización concedida por el foro primario, la cual respondía única y exclusivamente a los gastos incurridos en la etapa precontractual.[32]   Así pues, el 30 de agosto de 2024, el foro primario emitió *Resolución*.[33] En resumen, declaró *No Ha Lugar* a la solicitud de determinaciones y conclusiones de derecho adicionales toda vez que foro primario ya había atendido la controversia, considerado los testimonios  aquilatado la prueba desfilada. Sin embargo, el foro *a quo* reconoció que la cuantía pagada por PSG en la transacción con Rigau ascendía a sesenta mil dólares ($60,000.00) por lo que procedió a enmendar la

---

[32] *Íd.,* págs. 34-45.
[33] *Íd.,* págs. 14-20.

cantidad a pagar por parte de la Apelada en quinientos cincuenta y un mil ciento cincuenta dólares con veintitrés ($551,150.23).

Insatisfecho con este resultado, el 30 de septiembre de 2024, compareció la AAA mediante el recurso de epígrafe y formuló los siguientes señalamientos de error:

> Primer Error: Erró el TPI al conferirle un remedio a la corporación demandante-apelada, cuando ésta no estaba en "Good Standing" con el Departamento de Estado y cuando la prueba obtenida y admitida refleja que, debido a deudas con el IRS, dicha entidad estaba en efecto inactiva e inoperante en: las fechas relevantes y no podía tener la expectativa de firmar el contrato para el "CMMS" con la AAA, según lo requerido por el RFP.

> Segundo Error: Erró el TPI al descartar en su sentencia emitida el 6 de septiembre de 2006, las admisiones judiciales (estipulaciones) de hecho y las conclusiones de derecho, incompatibles con los hechos estipulados.

> Tercer Error: Erró el TPI al utilizar prueba de referencia como base para sostener su sentencia del 6 de septiembre de 2006, la cual fuera objetada durante el juicio y declarada con lugar.

> Cuarto Error: Erró el TPI en su evaluación y determinación de los daños económicos concedidos a la parte demandante-apelada bajo la doctrina de culpa-in-contrahendo en su sentencia del 10 de julio de 2024, por ser su análisis contrario a las directrices de la resolución del 6 de diciembre de 2017, la cual constituía la "ley del caso", así como ser igualmente contrario al derecho aplicable.

> Quinto Error: Erró el TPI al no deducir y tampoco considerar en su evaluación y en su consecuente determinación de, los daños en la sentencia del 10 de julio de 2024, el dinero del "grant" de PRIDCO a la parte demandante-apelada por la suma de $500,000.00 recibido durante el periodo de enero de 1997 a diciembre de 1998, deuda que le fue condonada y que utilizó para pagar su operación y pagarle a contratistas, por los que ahora también reclama que realizaron trabajos en "preparación" para implementar el contrato con la AAA.

> Sexto Error: Erró el TPI al concederle entera credibilidad y validez a los testimonios de Juan Rigau y el de su hija y contable Irma Rigau de la parte demandante-apelada en su sentencia del 10 de julio de 2024, al sostener que todos los gastos de nómina y pagos y reembolsos a sus empleados y contratistas para el periodo de "expectativa" entre enero 1997 y diciembre 1998 concernían exclusivamente al proyecto de la AAA, cuando los cheques presentados no identificaban el proyecto para el cual trabajaron esas personas y cuando del informe y el testimonio del perito de la AAA, Dr. Ramón Cao, éste pudo identificarse ingreso bruto de la parte demandante apelada por otros asuntos no relacionados con el contrato de la AAA durante dicho periodo.

El **3 de octubre de 2024**, esta Curia emitió *Resolución* en la cual, entre otros asuntos, se le concedió a la Apelante un término

de treinta (30) días contados a partir de la entrega de la regrabación de los procedimientos para que presentara la transcripción de la prueba oral estipulada ante este Tribunal. Asimismo, le concedimos a la Apelante que, un término de quince (15) días, a partir de la presentación de la transcripción, para presentar un alegato suplementario. De la misma manera dispusimos que la parte Apelada debería presentar su alegato en un término de treinta (30) días, a partir de la fecha de presentación del alegato suplementario.

En cumplimiento con lo ordenado, el 16 de octubre de 2024, la señora Vega Rivera presentó *Moción Informativa y Suplementando Escrito Presentado Sometiendo Transcripción de la Prueba Oral Estipulada,* mediante la cual informó la entrega de la transcripción de la prueba oral debidamente estipulada por las partes. De igual manera, tras varios asuntos procesales, el 13 de octubre de 2024, la señora Vega Rivera presentó su alegato suplementario y el 2 de diciembre del mismo año, el señor Pérez Arnal presentó *Alegato de Parte Apelada.* Con el beneficio de la comparecencia de ambas partes, de los documentos que obran en el expediente y de la transcripción de la prueba oral estipulada, procedemos resolver el asunto que está ante nuestra consideración.

**II.**

### A. La Determinaciones de Hechos, el Estándar de Revisión de Apreciación de Prueba y las Estipulaciones de Hechos y sus efectos

La Regla 43.2 de Procedimiento Civil, 32 LPRA Ap. V. R. 43.2 establece en lo pertinente que "[l]as determinaciones de hecho basadas en el testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos."

En nuestro ordenamiento jurídico, la "tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada". *Gómez Márquez et al. v. El Oriental*, 203 DPR 783, 792 (2020). Esto "incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Íd,* citando a *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013). Los tribunales apelativos "no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, no dirimimos credibilidad y no hacemos determinaciones de hechos". *Dávila Nieves v. Meléndez Marín, supra,* pág. 770.

Por ello, los tribunales apelativos no intervenimos con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza ese foro. *Pueblo v. Rivera Montalvo*, 205 DPR 352, 373 (2020). Sin embargo, esa deferencia descansa en un marco de discreción y razonabilidad. *Íd.* La discreción es "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *BPPR v. SLG Gómez-López* 213 DPR___ (2023) 2023 TSPR 145, pág. 23. Así que, ese juicio discrecional "no es en función al antojo o voluntad de uno, sin tasa ni limitación alguna". *Íd.* Los tribunales revisores podremos sustituir el criterio que utilizó el foro primario por el nuestro únicamente cuando existen circunstancias extraordinarias en las que se pruebe que el foro primario actuó con pasión, prejuicio o parcialidad, incurrió en craso abuso de discreción o en un error manifiesto o de derecho**.** *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 338 (2021).

Se dice que el tribunal incurrió en un error manifiesto "cuando, de un análisis de la totalidad de la evidencia, el tribunal apelativo queda convencido de que se cometió un error, aunque

haya evidencia que sostenga las conclusiones de hecho del tribunal". *Gómez Márquez et al. v. El Oriental*, supra, pág. 793. Esto implica que "la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble". *Íd.* Véase, también, *Pueblo v. Rivera Montalvo,* 205 DPR 352, 374 (2020). Dicho estándar de revisión, "restringe nuestra facultad para sustituir el criterio del foro primario a escenarios en los que de la prueba admitida *no exista base suficiente que apoye tal determinación". Pueblo v. Toro Martínez,* 200 DPR 834, 859 (2018). (Énfasis en original).

Por otro lado, el juzgador incurre en pasión, prejuicio o parcialidad si actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Pueblo v. Hernández Doble*, 210 DPR 850, 865 (2022) citando a *Dávila Nieves v. Meléndez Marín, supra*, pág. 782. De otra parte, un tribunal puede incurrir en abuso de discreción cuando el juez: (1) ignora sin fundamento algún hecho material importante que no podía pasar por alto, (2) concede demasiado peso a un hecho inmaterial y funda su decisión principalmente en ese hecho irrelevante, (3) a pesar de examinar todos los hechos del caso, hace un análisis liviano y la determinación resulta irrazonable. *Pueblo v. Sanders Cordero,* 199 DPR 827, 841 (2018).

Cónsono con lo anterior, la Regla 19 (A) del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 19, dispone lo siguiente:

> Cuando la parte apelante haya señalado algún error relacionado con la suficiencia de la prueba testifical o con la apreciación errónea de ésta por parte del tribunal apelado, **someterá una transcripción**, una exposición estipulada o una exposición narrativa de la prueba. (Énfasis nuestro).

A tenor con lo dispuesto en la aludida regla, aquella parte que señale un error referente a la suficiencia de la prueba o la apreciación errónea de esta es quien tiene la responsabilidad de someter al foro revisor una transcripción, una exposición estipulada o una exposición narrativa de la prueba. El foro intermedio apelativo no puede cumplir a cabalidad su función revisora sin que se le produzca, mediante alguno de los mecanismos provistos para ello, la prueba que tuvo ante sí el foro primario.

De otra parte, las estipulaciones son admisiones judiciales que implican un desistimiento formal de cualquier contención contraria a ellas. P.*R. Glass Corp. v. Tribunal Superior*, 103 DPR 223, 231 (1975). Tienen como finalidad evitar dilaciones, inconvenientes y gastos, por lo que su uso debe alentarse para lograr el propósito de hacer justicia rápida y económica. *Ramos Rivera* v. E.L.A. 148 DPR 118, 126 (1999). En nuestra jurisdicción se reconocen tres tipos de estipulaciones: **(1) las que constituyen admisiones de hechos y dispensan del requisito de probarlos**; (2) aquellas que reconocen derechos y tienen el alcance de una adjudicación, y (3) las estipulaciones que plantean determinado curso de acción, como, por ejemplo, la celebración de una conferencia con antelación al juicio; someter un asunto a un comisionado especial; o la admisión de determinadas pruebas. *Rivera Menéndez,* supra, *P.R. Glass Corp. v. Tribunal Superior,* supra, pág. 230 (1975).

Las estipulaciones de hechos tienen el efecto de dispensar el requisito de probar tales hechos. Es decir, cuando se admite o estipula un hecho, la parte está relevada de probarlo. *Sepúlveda v. Depto. de Salud,* 145 DPR 560, 571 (1998). **En estas situaciones, la estipulación sustituye la prueba que hubiera sido presentada en la vista del caso.** *Mora Dev. Corp. v. Sandín,* 118 DPR 733, 752

(1987). Una vez estipulado un hecho, la parte no puede impugnar el mismo posteriormente. *Maldonado v. Consejo de Titulares*, 111 DPR 427, 434-435 (1981). Sin embargo, las teorías o aseveraciones de las partes no forman parte de este tipo de estipulación. *Asoc. Auténtica Empl. v. Municipio de Bayamón*, 111 DPR 527, 531 (1981).

### B. Prueba de referencia

La Prueba de referencia es toda declaración que a su vez sea una aseveración ya sea oral o escrita que no hace el declarante al testificar en el juicio, y que se ofrece para probar la verdad de lo aseverado. *Toledo Maldonado v. Cartagena Ortiz*, 132 DPR 249, 257 (1992) Como regla general, este tipo de evidencia es inadmisible en los procesos judiciales. *Maysonet v. Granda*, 133 DPR 676, 684 (1993). Su exclusión se debe a la falta de oportunidad de la parte adversa en contrainterrogar a la persona declarante, los riesgos que ella representa en cuanto a la narración del evento, percepción, recuerdo del acontecimiento y sinceridad de la declarante. *Nieves Lopez v. Rexach Bonet*, 124 DPR 427, 433, (1989)

La prueba de referencia lesiona el derecho que tienen las partes a confrontarse con la evidencia que se presente en su contra. *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, 123 DPR 1, 34-35 (1988). Sin embargo, cabe destacar que, si la parte adversa tiene o ha tenido la oportunidad de contrainterrogar a la persona declarante, se disipan los inconvenientes que trae consigo la prueba de referencia y la declaración realizada debe admitirse en evidencia. *Pueblo v. Santiago Colón,* 125 DPR 442 449 (1990) (Sentencia).

La regla de exclusión está esencialmente fundada en el hecho de que la misma no ofrece garantías circunstanciales de confiabilidad y exactitud. *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*,

supra. El profesor Chiesa Aponte señala que la razón que motiva la regla general de exclusión de prueba de referencia es la falta de confiabilidad de la misma y su dudoso valor probatorio, puesto que, de ordinario, una declaración que constituye prueba de referencia no tiene las garantías de confiabilidad que se produce mediante un testimonio en corte. Un testimonio en corte se hace bajo juramento, frente a la parte perjudicada por la declaración, frente al juzgador que ha de aquilatar su valor probatorio y está sujeta al contrainterrogatorio de las partes que tengan a bien hacerlo. E. L. Chiesa Aponte, *Tratado de Derecho Probatorio (Reglas de Evidencia de Puerto Rico y Federales)*, República Dominicana, Pubs. J.T.S., Tomo II, págs. 616-617.

Ahora bien, como todo principio general, el mismo no es absoluto, por lo que existen excepciones a la regla de exclusión de prueba de referencia. *Maysonet v. Granda*, supra. Entre las excepciones a la regla de exclusión de la prueba de referencia se encuentran las declaraciones anteriores de un testigo no disponible. Sobre ello, la Regla 64 de Evidencia de Puerto Rico de 1979 dispuso lo siguiente:[34]

> Regla 64. No disponibilidad del testigo
> (A) Definición.—Incluye situaciones en que el declarante:
>> 1. Está exento o impedido de declarar por razón de un privilegio reconocido en esta Regla en relación al asunto u objeto de su declaración, o
>> 2. insiste en no declarar a pesar de orden del tribunal para que declare, o
>> 3. testifica no recordar, o
>> 4. ha fallecido o está imposibilitado de comparecer a declarar por razón de enfermedad o impedimento mental o físico, o
>> 5. está ausente de la vista y el proponente de su declaración ha desplegado diligencia para conseguir su comparecencia mediante citación del tribunal.

---

[34] Hacemos referencia a las Reglas de Evidencia de 1979, toda vez que estas eran las reglas vigentes en la fecha en que se llevó a cabo el juicio en su fondo que culminó con el dictamen emitido por el foro primario el 6 de septiembre de 2006 y el cual, la parte Apelante alega se usó prueba de referencia debidamente objetada en su tercer señalamiento de error.

No se entenderá que un declarante no está disponible como testigo si la alegada razón de la alegada no disponibilidad ha sido motivada por la gestión o conducta del proponente de la declaración con el propósito de evitar que el declarante comparezca o declare.

(B) Cuando el declarante no está disponible como testigo, es admisible como excepción a la regla de prueba de referencia:

*Testimonio anterior*--Un testimonio dado como testigo en otra vista o una deposición tomada a derecho del mismo u otro procedimiento, si es ofrecido contra una persona que en la ocasión en que se hizo la declaración ofreció la misma para su beneficio o tuvo la oportunidad de contrainterrogar al declarante con un interés o motivo similar al que tiene en la vista.

De una lectura de la citada Regla, podemos colegir que, antes de dar paso a la admisión de prueba de referencia por algunas de las excepciones allí establecidas, el tribunal debe hacer una determinación de que la persona testigo o declarante no está disponible para testificar por algunas de las situaciones recogidas en sus incisos. Luego de que se haya hecho la determinación de que la persona testigo no está disponible, se puede admitir la prueba de referencia bajo alguna de las excepciones contenidas en la citada Regla.

### C. *Culpa in Contrahendo*

El Tribunal Supremo de Puerto Rico expresó que a partir de *Prods. Tommy Muñiz v. COPAN*, 113 DPR 517 (1982), la doctrina de culpa *in contrahendo* tiene cabida en el ordenamiento jurídico puertorriqueño. Según este principio, "no actuar en concordancia con lo que exige la buena fe requerida en el periodo precontractual apareja incurrir en la responsabilidad que se deriva de la llamada culpa in contrahendo". *PRFS* v. *Promoexport*, 187 DPR 42, 57 (2012).

Se trata de un supuesto de responsabilidad de carácter precontractual que puede surgir al amparo de figuras como la culpa, el dolo, el fraude, la ausencia de buena fe, el abuso de derecho u otros principios generales del derecho. *Perfect Cleaning* v. *Cardiovascular*, 172 DPR 139, 145 (2007). No obstante, el

Tribunal Supremo también ha reconocido la aplicabilidad de la doctrina en aquellas instancias en que una de las partes que interviene en el proceso de formación de un contrato actúa negligentemente y dicha actuación causa daños. *Colón* v. *Glamorous Nails*, 167 DPR 33, 46 (2006).

Sin embargo, es necesario aclarar que en nuestro ordenamiento no se reconoce la existencia de una obligación de culminar los tratos, por lo que el mero rompimiento no es suficiente para incurrir en responsabilidad. *Prods. Tommy Muñiz* v. *COPAN*, *supra*, pág. 530. El análisis para determinar si hay responsabilidad extracontractual por culpa *in contrahendo* debe realizarse a base de los siguientes factores:

(1) el desarrollo de las negociaciones,
(2) cómo comenzaron,
(3) el curso que siguieron,
(4) la conducta de las partes durante su transcurso,
(5) la etapa en que se produjo el rompimiento, y
(6) las expectativas razonables de las partes en la conclusión del contrato, así como cualquier otra circunstancia pertinente conforme los hechos del caso sometidos a escrutinio judicial. *PRFS* v. *Promoexport*, *supra*, pág. 77.

En *Prods. Tommy Muñiz v. COPAN, supra.* el señor Arturo Carrión, presidente del Comité Organizador de los VIII Juegos Panamericanos ("COPAN"), se reunió con distintos productores de televisión con el propósito de discutir la venta de los derechos exclusivos para la transmisión de los juegos en Puerto Rico y les invitó a someter licitaciones. Producciones Tommy Muñiz, Inc. resultó ser el mejor postor entre los tres (3) productores que sometieron ofertas y la Junta de Subasta de COPAN notificó por escrito al señor Muñiz que se le había adjudicado la subasta, advirtiéndole que se le someterían, para su firma, los documentos escritos. Sin embargo, tras circular varios borradores del contrato, durante el proceso de negociación del mismo, COPAN notificó al

señor Muñiz que había tomado la decisión de transmitir los juegos por las emisoras del Gobierno, por lo que el contrato no se firmó aun cuando la subasta había sido adjudicada al señor Muñiz. En ese contexto, el Tribunal Supremo resolvió que COPAN era legalmente responsable de los daños sufridos por el señor Muñiz por causa de su retiro de las negociaciones y que dicha responsabilidad era de carácter extracontractual concluyendo así que se configuró la culpa in *contrahendo* por parte de COPAN.

Por otro lado, en *Colón v. Glamorous Nails*, 167 DPR 33, 44-47 (2006), el Tribunal Supremo revisitó el tema de la culpa in *contrahendo* como sigue:

> Es principio básico del derecho de obligaciones que nadie está obligado a contratar. J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1978, T. II, Vol. I, pág. 226. *Prods. Tommy Muñiz v. COPAN*, 113 D.P.R. 517 (1982), pág. 526. Esto "tiene como consecuencia que las partes no se encuentren obligadas a proseguir con las negociaciones hasta perfeccionar el contrato, sino que están en libertad de contraer el vínculo o retirarse, según convenga a sus mejores intereses." *Prods. Tommy Muñiz v. COPAN, supra*, citando a Albaladejo, *Derecho Civil*, 2da ed., T.I, pág. 317.

No obstante, aun cuando no se hubiera perfeccionado un contrato, nuestro ordenamiento reconoce que:

> [l]as negociaciones preliminares generan *una relación de carácter social* que impone a las partes el deber de comportarse de acuerdo con la buena fe, que no impera solamente en las relaciones jurídicas ya establecidas o constituidas, sino también en las relaciones derivadas de un simple contrato social." *Prods. Tommy Muñiz v. COPAN,* supra, en las págs. 526 a 527 citando a Díez Picazo en *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. I, en la pág. 191.

Asimismo, en *Prods. Tommy Muñiz v. COPAN, supra*, pág. 528, el Tribunal Supremo expuso lo siguiente:

> En efecto, el grueso de la doctrina considera hecho ilícito el rompimiento injustificado de las negociaciones, porque constituye un quebrantamiento de la buena fe que, como sabemos, penetra todo nuestro ordenamiento positivo. La buena fe impone a las partes un deber de lealtad recíproca en las negociaciones.

Cónsono con lo anterior, en *Prods. Tommy Muñiz v. COPAN, supra,* fue determinado que **la responsabilidad que**

**genera el incumplimiento con el deber de actuar de buena fe durante las negociaciones es de naturaleza extracontractual**. Se asienta esta responsabilidad en que **la suspensión injustificada** de las negociaciones constituye un quebrantamiento de la buena fe que penetra todo nuestro ordenamiento positivo el cual les impone a las partes un deber de lealtad recíproca en las negociaciones. *Prods. Tommy Muñiz v. COPAN, supra,* pág. 528. Por tanto, ha sido resuelto que para determinar si ha mediado culpa en la terminación de unos tratos preliminares "es preciso considerar las circunstancias del rompimiento, específicamente: 1) el desarrollo de las negociaciones, 2) como comenzaron, 3) el curso que siguieron, 4) la conducta de las partes durante su transcurso, 5) la etapa en que se produjo el rompimiento, y 6) las expectativas razonables de las partes en la conclusión del contrato, así como cualquier otra circunstancia pertinente conforme a los hechos del caso sometidos a escrutinio judicial". *Íd.*, pág. 530.

Finalmente, por su pertinencia con el caso que nos ocupa, reproducimos y citamos el razonamiento del Tribunal Supremo en el caso *Prods. Tommy Muñiz v. COPAN,* supra, a la pág.531, que culminó en su conclusión de que se configuró la doctrina de culpa in *contrahendo:*

> Los hechos revelan que COPAN no manifestó su voluntad con la claridad y minuciosidad que la naturaleza del negocio exigía**, lo que provocó en Muñiz la errónea creencia de que la adjudicación de la subasta había perfeccionado el contrato y, por tanto, podía continuar sin pérdida de tiempo los preparativos para transmitir los juegos. Indudablemente, esta creencia se fortaleció al notificarle COPAN que '[e]n breve se le someterán, para su firma, los documentos escritos ratificando [sic] los acuerdos entre *ustedes y COPAN-79'.* En el curso de las negociaciones sobre el centro de televisión se prepararon siete borradores de contrato, unos por COPAN y otros por Muñiz, que fueron objeto de consideración. El borrador número 4 fue aceptado en principio por COPAN y el número 5 tuvo el endoso de Carrión. **El curso de estas negociaciones crearon en Muñiz una expectativa razonable de que el contrato habría de concluirse. Al fin y al cabo había sido el licitador que había obtenido la buena pro** y ya desde el 1977 COPAN había descartado transmitir los juegos por las emisoras del gobierno, por lo que era razonable confiar que se llegaría a un acuerdo

sobre el centro de televisión, que satisficiera los intereses legítimos de ambas partes (Énfasis nuestro).

### D. Las Subastas Gubernamentales y el Request For Proposal (RFP)

En *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 DPR 864, 871 (1990), el Tribunal Supremo de Puerto Rico reiteró la doctrina expuesta desde *Justiniano v. ELA,* 100 DPR 334 (1971), a los efectos de que los propósitos de la legislación que regula la realización de obras y la contratación de servicios para el Gobierno y los sistemas de subastas gubernamentales son precisamente ésos: **proteger los intereses y dineros del pueblo al promover la competencia para lograr los precios más bajos posibles**; evitar el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia y el descuido al otorgarse los contratos, y minimizar los riesgos de incumplimiento (Énfasis nuestro).

El procedimiento comúnmente utilizado por el Gobierno para adquirir bienes y servicios es la subasta pública formal u ofertas selladas. *Caribbean Communications v. Pol. De P.R.*, 176 DPR 978, 994 (2009). Por otro lado, nuestro más Alto Foro ha validado el uso del requerimiento de propuestas, compra negociada o *request for proposal* (RFP). *Caribbean Communications v. Pol. De P.R.*, *supra*, pág. 996. El RFP es un mecanismo informal y flexible que permite al oferente negociar con el gobierno o con los municipios y enmendar o revisar las ofertas antes de la adjudicación de un contrato de adquisición de bienes y servicios. *PR Eco Park et al. V. Min. De Yauco*, 202 DPR 525, 532 (2019). **La característica principal del RFP es que se admite una negociación durante la evaluación de las propuestas. Lo anterior responde a la necesidad de adquirir bienes o servicios especializados por ser asuntos altamente técnicos y complejos, o a la escasez de competidores cualificados.** *St. James Sec. v AEE,*213 DPR___ (2023).2023 TSPR 149, pág. 11.

Al distinguir el RFP del proceso de la subasta formal, el Tribunal Supremo de Puerto Rico ha expresado lo siguiente:

> "En comparación con las subastas formales, el requerimiento de propuestas se distingue por ser un procedimiento más flexible, por lo que resulta práctico cuando la subasta persigue la adquisición de bienes y servicios especializados que involucran asuntos técnicos o muy complejos o cuando existen pocos competidores cualificados. Los requisitos a considerar en la adjudicación del contrato se enumeran en el (RFP) el cual incluye, entre otros, el valor que se asigne a éstos, el itinerario para recibir y evaluar las propuestas, y adjudicar la buena pro, así como los términos del contrato. Estos asuntos pueden discutirse durante la celebración de reuniones prepropuestas, de forma tal que se logre un mejor entendimiento sobre los requisitos y las condiciones del RFP." (Citas omitidas). *Caribbean Communications v. Pol. De P.R., supra*, pág. 996-997.

En lo pertinente a perseguir el resarcimiento del llamado interés negativo al amparo de la doctrina conocida como *culpa in contrahendo,* es importante apuntar que en, *RBR Const., S.E. v. A.C.,* 149 D.P.R. 836 (1999), la controversia pasó por la revisión del Tribunal de Primera Instancia y, como resultado final del proceso apelativo, el Tribunal Supremo lo devolvió al foro judicial primario para atender los efectos de la anulación arbitraria de una subasta. En efecto, concluyó que la controversia no se tornaba académica por el hecho de que se hubiese celebrado una segunda subasta. Sobre esos extremos, expresó el Tribunal Supremo que entre "los daños extracontractuales sufridos en casos como el de autos, podrían encontrarse, por ejemplo, los costos en los que se incurrió en prepararse para la licitación arbitrariamente anulada y otros gastos relacionados, incluyendo los intereses desde que se incurre en éstos. *RBR Const., S.E. v. A.C., supra*, págs. 847-848.

En *RBR Const., S.E. v. A.C., supra*, pág. 848, el Tribunal Supremo concluyó lo siguiente:

> Avalar la postura de que la celebración de una segunda subasta torna las reclamaciones de autos en académicas, sentaría un peligroso precedente que abriría las puertas a la arbitrariedad, la corrupción y el despilfarro de fondos públicos. En la práctica, toda subasta de la ACT anulada ilegalmente quedaría inmune a la revisión judicial con la mera celebración de una segunda subasta. Esto podría equivaler a darle un cheque en blanco al funcionario de

gobierno para que continúe celebrando subastas hasta que el postor de su predilección obtenga la buena pro.

En vista de que la controversia ante nos no es académica, nos corresponde considerar la legalidad de las actuaciones de la Junta al anular la subasta y rechazar la licitación de RBR.

Posteriormente, en *Perfect Cleaning v. Cardiovascular*, 172 DPR 139 (2007), Perfect Cleaning presentó una demanda sobre daños y perjuicios contra el Centro Cardiovascular y su Junta de Subastas, amparándose en el dictamen del foro apelativo que revocó la adjudicación de la subasta hecha a favor de otro licitador. Sostuvo en la demanda que la subasta antes mencionada fue ilegalmente adjudicada a favor de NBM Enterprises y que dicha actuación le ocasionó daños, ya que —a su entender— fue el postor más bajo que cumplió con todas las exigencias. En vista de ello, Perfect Cleaning solicitó una compensación de $2,008,800. El foro primario desestimó la Demanda y el Tribunal de Apelaciones revocó dicha desestimación por entender que Perfect Cleaning podía reclamarle al Centro Cardiovascular los gastos y desembolsos realizados para participar de la subasta al amparo de las doctrinas de culpa *in contrahendo* y abuso de derecho. Sin embargo, el Tribunal Supremo revocó el dictamen del Tribunal de Apelaciones y no le reconoció a Perfect Cleaning una causa de acción por estos hechos. **Sobre estos extremos concluyó el Tribunal Supremo que un licitador a quien no se le adjudicó una subasta cuyo resultado es posteriormente revocado no tiene a su favor una causa de acción en daños y perjuicios contra la entidad gubernamental de que se trate.**

Finalmente, expresó el Tribunal Supremo que dado que Perfect Cleaning descansó únicamente en la norma pautada en *RBR Const., S.E. v. A.C., supra,* y ya que dicha norma no aplicaba a los hechos del caso, procedía concluir que Perfect Cleaning no tenía derecho a remedio alguno, aun interpretando sus alegaciones

de la forma más favorable posible. Con este razonamiento, resolvió el Tribunal Supremo que Perfect Cleaning no tenía a su disposición una causa de acción en daños y perjuicios para reclamarle al Centro Cardiovascular los gastos y desembolsos realizados para participar de la subasta en la que no resultó favorecida. *Perfect Cleaning v. Cardiovascular, supra, pág. 149.*

### E. Ley del Caso

La doctrina de la ley del caso es un principio que garantiza el trámite ordenado y rápido de los litigios, así como la estabilidad y la certeza del derecho que aplican los tribunales. Constituye una sana práctica judicial que solo puede obviarse en situaciones extremas. *Núñez Borges v. Pauneto Rivera,* 130 DPR 749, 754-755 (1992); *Torres Cruz v. Municipio de San Juan,* 103 DPR 217, 222 (1975). Por otro lado, la doctrina de la ley del caso procura que se respeten como finales aquellas controversias sometidas, litigadas y decididas de manera firme, por un tribunal dentro de un caso. *Cacho Pérez v. Hatton Gotay,* 195 DPR 1, 9 (2016). Es decir, deben evitarse, en lo posible, la emisión de dictámenes contradictorios e inconsistentes. *Íd.*

En nuestro sistema de derecho, solo constituyen la ley del caso los derechos y obligaciones adjudicados en el ámbito judicial, mediante dictamen final y firme. *Cacho Pérez v. Hatton Gotay, supra,* pág. 8; *Mgmt. Adm. Servs. Corp. v. E.L.A.,* 152 DPR 599, 606-607 (2000). Ello, debido a que esos derechos y obligaciones gozan de finalidad y firmeza para que las partes pueden proceder "sobre unas directrices confiables y certeras". *Íd,* págs. 8-9. Así que, de ordinario, las controversias que han sido adjudicadas por el foro primario o por un tribunal apelativo no pueden rexaminarse. *Íd.*

Particularmente, esta doctrina establece que las determinaciones judiciales que constituyen ley del caso serán

aquellas *cuestiones finales* consideradas y decididas por el tribunal. *Cacho Pérez v. Hatton Gotay, supra; Félix v. Las Haciendas*, 165 DPR 832, 843 (2005). Como norma general, estas determinaciones obligan, "tanto al tribunal de instancia como al que las dictó, si el caso vuelve ante su consideración". Es decir, esta doctrina solo podrá invocarse cuando exista una decisión final de la controversia en sus méritos. *Íd.*

La doctrina de la ley del caso no es un mandato invariable o inflexible. Recoge, más bien, una costumbre judicial deseable que consiste en que las controversias sometidas, litigadas y decididas por un tribunal dentro de una misma causa deben usualmente respetarse como finales. De ese modo, las partes en un litigio pueden, en lo posible, conducir su proceder en el pleito sobre unas directrices judiciales confiables y certeras. *Rosso Descartes v. B.G.F*, 187 DPR 184 (2012); *Núñez Borges v. Pauneto Rivera, supra.* No obstante, cuando la ley del caso es errónea y puede causar una gran injusticia, el mismo foro sentenciador o un foro de jerarquía superior puede emplear una norma de derecho diferente, solo en situaciones excepcionales. *Mgmt. Adm. Servs. Corp. v. E.L.A., supra,* pág. 607.

"[S]olo cuando se presenta un atentado contra los principios básicos de la justicia, es que los tribunales pueden descartar la aplicabilidad de la doctrina de la ley del caso". *Cacho Pérez v. Hatton Gotay, supra,* pág. 10. Lo importante es que se alegue su exclusión mediante un mecanismo procesalmente adecuado y que el foro que atienda la cuestión tenga jurisdicción para considerarla y emitir la nueva determinación. *Noriega v. Gobernador*, 130 DPR 919, 931 (1992); *Srio. del Trabajo v. Tribunal Superior*, 95 DPR 136, 140 (1967).

**III.**

En el caso que nos ocupa, la AAA nos solicita tanto la revocación de un dictamen intitulado, *Sentencia Parcial*, emitido el 6 de septiembre de 2006, notificado el 11 de septiembre de ese año y de la *Sentencia* dictada el 10 de julio de 2024, notificada el 12 de julio del mismo año. Es importante aclarar que, pese a que el dictamen emitido en el año 2006 lleva por título *Sentencia Parcial*, el mismo se trata más bien de una resolución interlocutoria. Ello pues el foro primario bifurcó la controversia que tenía ante su consideración, y primero adjudicó si había o no responsabilidad por parte de la AAA y posterior a esta determinación, entonces el foro primario entraría a valorizar los daños. Por ende, "el dictamen relativo al aspecto de negligencia, por no ser final, no es apelable; es una resolución que sólo puede ser revisada mediante un recurso de *certiorari*". *García v. Padró*, 165 DPR 324, 334 (2005). Surge del expediente, que dicha determinación fue recurrida tanto a este foro apelativo intermedio como al Tribunal Supremo, y en ambas ocasiones, se denegó el *certiorari*. Es menester resaltar que "la denegatoria a expedir no implica la ausencia de error en el dictamen, cuya revisión se solicitó, ni constituye una adjudicación en sus méritos". *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 98 (2008). En tales casos, la parte afectada por la denegatoria "podrá revisar esta determinación cuando el Tribunal de Primera Instancia dicte sentencia final y ésta resulta adversa para la parte, quien aún estima importante revisarla por entender que ha afectado la decisión del caso". *Íd.*

En armonía con lo anterior, cabe subrayar que la determinación del dictamen emitido en el año 2006 fue acogido y reafirmado en la *Sentencia* dictada en el año 2024,[35] la cual, al ser final, es la que está siendo sujeto de revisión en el recurso de

---

[35] Véase, Apéndice del Recurso, pág. 11.

epígrafe. Aclarado lo anterior, procedemos atender la controversia que está ante nuestra consideración.

En primer lugar, procederemos a atender los primeros tres (3) señalamientos de error formulados por la Apelante, los cuales están relacionados al dictamen emitido por el foro primario en el 2006. En lo pertinente, en la vista celebrada en el año 2005 **para la adjudicación de responsabilidad por los daños alegados por el señor Rigau** y la determinación del foro primario en esa etapa sobre la culpa *in contrahendo*, la AAA señala, como primer error en el recurso de epígrafe, que incidió el foro primario al conferirle un remedio a la corporación apelada, cuando ésta no estaba en *Good Standing* con el Departamento de Estado y cuando la prueba obtenida y admitida refleja que, debido a deudas con el IRS, dicha entidad estaba inactiva e inoperante en las fechas relevantes. En esencia, sostiene la AAA que el Apelado no podía tener la expectativa de firmar el contrato para el CMMS con la AAA, según lo requerido por el RFP, toda vez que no pudo probar que fuera el proponente seleccionado. Por este fundamento, la AAA alega que el foro primario incidió al determinar que se configuró la culpa *in contrahendo* sin que existiese una adjudicación del RFP a favor del Apelado.

No empece a ello, el señor Rigau fundamentó su reclamo ante el foro primario en que negoció de buena fe con la AAA el cumplimiento de los requisitos del RFP sin que la Apelante otorgara el contrato durante dicho proceso de negociación con los licitadores.

Como cuestión de umbral, aun concediéndole deferencia a la credibilidad que le mereció al foro primario la prueba oral desfilada, es un hecho probado e incontrovertido que **el señor Rigau nunca recibió notificación escrita de la AAA de que la propuesta de su empresa hubiera sido seleccionada en el RFP**.

Sobre estos extremos, el Apelado reconoció en la vista celebrada el 5 de diciembre de 2005, que no había realizado las gestiones para conseguir la fianza que exigía el RFP porque no había recibido notificación escrita de que hubiese sido el proponente seleccionado.[36] Sobre esto último, destacamos el siguiente extracto de la Transcripción de la Prueba Oral de la vista de 5 de diciembre de 2005 que obra en el expediente:

> P En la sección L, del "RFP", del Exhibit número 2 estipulado, ahí dice que diez días, a los diez días de usted haber sido notificado, usted digo yo de la, del contratista haya sido notificado y que ha sido seleccionado, éste tiene que conseguir una fianza de cumplimiento, un "performance bond".
>
> R Eso es así.
>
> P Okay. ¿Usted está consciente que eso estaba dispuesto ahí en el "RFP"?
>
> R Eso es típico de este tipo de contrato.
>
> P Pero lo cierto es que usted no había hecho gestiones para conseguir ese "performance bond" hasta el día que radicó la demanda...
>
> R No, porque estábamos en el proceso de negociación y era un proceso que tomó casi dos años.
>
> P Correcto.
>
> R Para indicar lo que se iba a hacer, lo que se iba a hacer, y nunca cumplieron con la responsabilidad de hacerlo.
>
> P Bueno, **¿lo cierto es que usted nunca recibió una notificación escrita de que había sido seleccionado?**
>
> R **No**, el problema es que ese era el "modus operandi" de la operación de PSG en el...
>
> P Yo le pregunto, **¿Qué si es cierto que usted nunca recibió una notificación escrita?**
>
> R No, pero tuvimos diversidad de...
>
> P "que como usted, escuche, **como usted no había recibido esa notificación escrita**, usted entendía que todavía no había que hacer la gestión de la fianza.
>
> R Es correcto.
>
> P En los contratos que usted había tenido con otras agencias públicas, se le había exigido una fianza de cumplimiento.
>
> R En muy pocos casos. Los contratos profesionales normalmente no llevan una fianza de cumplimiento.
>
> P ¿Y el caso que se le había exigido, usted si las había tenido y las había...
>
> R (ininteligible)
>
> P ...porque sabe que eso es parte esencial también?
>
> R En algunos casos.

---

[36] Véase, Apéndice de la Apelación, pág. 616.

> P Y en este caso, según lo establecía el "RFP", era parte esencial.
>
> R En este caso era un requerimiento del "RPP".
>
> P Le pido que se le muestre al testigo, por favor, el Exhibit número 5 estipulado. Ese es el informe final que presentó el comité evaluador que recibió las propuestas en respuesta al "RFP" de marzo del '96. Eso es correcto. Y en ese informe, doctor, le pido que vaya a la página cuatro, dice que una vez se seleccione a un contratista, el comité le va a notificar esa recomendación al Director Ejecutivo de Acueducto para que comienza, dice ahí, negociaciones para la ejecución de un contrato.
>
> R Es correcto.
>
> P Comience negociaciones.
>
> R Eso es así.
>
> P Por lo tanto, aún cuando el comité haya hecho una recomendación especifica de un contratista, digamos contratista equis, eso de por si no le garantiza al contratista que tiene el contrato, porque tiene que pasar el periodo de negociación con el Director de la Autoridad de Acueductos.
>
> R Tenemos que ir a esa reunión, que según el Reglamento de Emergencia obligaba también a pasar ese proceso. Eso está en armonía con ese reglamento.
>
> P O sea, que aún cuando usted entendiera que a base de este informe su firma había sido seleccionada, usted estaba claro que todavía usted no tenía el contrato asegurado.
>
> R Eso es correcto (Énfasis nuestro).[37]

Nótese que el propio señor Rigau, testificó que no recibió notificación de que su compañía fue seleccionada. Es preciso destacar que contrario a los hechos probados en el caso de epígrafe, en *Tommy Muñiz v. COPAN, supra,* jurisprudencia en la cual tanto el Apelado como el foro primario **fundamentaron** su razonamiento sobre la aplicabilidad de la doctrina de culpa *in contrahendo,* la Junta de Subastas de COPAN **ya había notificado** por escrito al señor Muñiz que se le había adjudicado la subasta y que se le estarían enviando los documentos para la firma del contrato. En el precitado caso, luego de adjudicada la subasta, el señor Muñiz entró en negociaciones con COPAN para la firma del contrato. Una vez se le presentó el documento para la firma del contrato, este lo objetó porque según sostuvo, contenía cláusulas onerosas no incluidas en la licitación. En ese sentido, la culpa *in contrahendo* se configuró en esta **etapa posterior a la**

---

[37] *Íd.*, pág. 615 línea 17 - pág. 618 línea 618.

**adjudicación** de la subasta, en el proceso de las negociaciones precontractuales, cuando finalmente COPAN, durante el proceso de negociación precontractual y luego de adjudicada la subasta al señor Muñiz, le comunicó que había decidido transmitir los Juegos Panamericanos por las emisoras del Gobierno de Puerto Rico y suspendió las negociaciones para la firma del contrato.

Ahora bien, en el caso que nos ocupa, estamos ante un escenario totalmente distinto, toda vez que es un hecho probado que hay **ausencia de adjudicación del RFP para el cual el señor Rigau licitó**. Por ello, en este contexto particular, **no cabe hablar de *culpa in contrahendo*, ya que la expectativa del señor Rigau para la firma del contrato es una irrazonable puesto que estaba sujeta a que se le adjudicara el RFP, lo que es un hecho probado que nunca ocurrió.** En consonancia con lo anterior, es menester destacar las siguientes determinaciones de hechos formuladas por el foro primario en el dictamen emitido en el 2006:

75. A principios de 1997 (mediados de febrero) Rigau se reúne con el Sr. Orlando Colón y le hace una presentación.

76. En esta reunión el Sr. Colón le indica a Rigau que están esperando que PSG este listo para comenzar con el proyecto. Le indicó que no se podía comenzar con el proyecto por dos (2) razones:

    a. Se iban a consolidar setecientas (700) personas. No se sabía si a las personas que ellos le darían el adiestramiento iban a estar disponibles después.

    b. Había un caso que podía ir al Tribunal entre PSG y "Severn Trend". Le indicó que hasta que no resolviera ese lio no se podía comenzar la implantación del producto de Rigau.

77. En ese momento Rigau entendió que las razones dadas para retrasar la implementación del producto eran razonables.

78. En ese momento no se había cancelado la subasta, lo que habían era posposiciones de la fecha de inicio del proyecto.

79. El 15 de noviembre de 1997, Rigau se reúne con el Ing. Benjamín Pomales, Director Ejecutivo de la AAA.

80. Dicha reunión se llevó a cabo en el piso 10, en el salón de conferencias a las 2:00 pm.

81. En la misma estuvieron presentes: Rigau, Sr. Leopoldo García (representante de ventas de Rigau), Ing. Benjamín Pomales, Sr. Orlando Colón y el director de

sistemas de información que le respondía al Sr. Orlando Colón.

82. En dicha reunión se llevó a cabo una presentación del producto de Rigau para exponer lo concerniente al proyecto. Los presentes le hicieron varias preguntas a Rigau. La mayoría de las mismas iban dirigidas a cómo iba a trabajar con la unión. A lo cual Rigau le indicó que con ese "problema" ya habían trabajado en la planta de Barceloneta.

83. Durante la reunión el Ing. Pomales indica que ve el proyecto muy bien y que lo veía necesario para la AAA.

84. Al finalizar la presentación, el Ing. Pomales le da instrucciones al Sr. Orlando Colón para que comenzara el proyecto.

85. Rigau entendió por esas expresiones del Ing. Pomales que éste le dio su endoso total a la aplicación y al proyecto. **En ese momento no le cabe la menor duda de que el proyecto era de él** (Énfasis nuestro).[38]

Es de observarse que la expectativa que el señor Rigau tenía de que se firmaría un contrato fue, entre otros asuntos, a base de reuniones con ciertos funcionarios. Reiteramos que, en el caso de autos, contrario a los hechos del caso *Tommy Muñiz v. COPAN, supra,* la oferta del señor Rigau **no fue aceptada formalmente por la AAA mediante una carta de adjudicación del RFP sobre los renglones licitados por el Apelado.** Si bien este superó la etapa de cualificación como licitador proponente conocida como *Request for Qualification* ("RFQ"), ello no implicaba que se le fuera adjudicar finalmente el RFP para el cual presentó su propuesta.

Asimismo, contrario al caso de marras, en *Tommy Muñiz v. COPAN, supra,* las negociaciones **posteriores a la adjudicación de la subasta a favor del señor Muñiz**, no lograron producir un acuerdo de voluntades sobre el centro de televisión, que pudiera generar un vínculo obligacional entre las partes, por lo que la cancelación de dichas negociaciones ocurrió cuando el señor Muñiz ya tenía una expectativa real de firmar el contrato.

Conforme al razonamiento anteriormente esbozado, concluimos que en el escenario de la contratación gubernamental, la aplicación de la doctrina de culpa *in contrahendo* requiere

---

[38] *Íd.*, págs. 56-57.

mesura y cautela, ya que la etapa precontractual que genera expectativa razonable del licitador o proponente de firmar el contrato para prestar los servicios objeto de la licitación **debe estar precedida por la adjudicación de la subasta formal o el RFP**, según sea el caso, salvo circunstancia extraordinarias que en este caso no ocurrieron. Es decir, sin una adjudicación formal de la buena pro, no se puede hablar de negociaciones precontractuales ni de expectativa razonable para contratar con el gobierno toda vez que es un requisito indispensable para este tipo de contratación haber sido el proponente seleccionado y no un mero participante del proceso de subasta.[39]

De otro lado, surge de la determinación de hechos probados que la expectativa del señor Rigau estaba arraigada en que como anteriormente, durante un estado de emergencia, había sido contratado por la AAA sin la celebración de una subasta ni RFP y que como se había implementado un proyecto piloto sometido por el Apelado para la instalación del CMMS en Barceloneta, pues este

---

[39] Posterior al 2006, nuestro estado de derecho ha sido enfático en que la mera participación en procesos de subasta, por si sola, no confiere derechos. Así, el Tribunal Supremo de Puerto Rico en *Perfect Cleaning v. Cardiovascular*, supra, pág. 148 expresó que "debemos recordar que las subastas son sólo invitaciones a presentar ofertas, por lo que la mera participación en dichos eventos no confiere derechos".

Asimismo, la *Ley de la Administración de Servicios Generales para la Centralización de las Compras del Gobierno de Puerto Rico de 2019* Ley Núm. 73-2019, según enmendada 3 L.P.R.A. § 9831 et seq. dispone en su Artículo 21 (d) lo que sigue:

Solicitud de Propuestas y/o Solicitud de Propuestas Selladas y/o Request for Proposal (RFP).

> El RFP permite la compra negociada y confiere a los licitadores la oportunidad de revisar y modificar sus ofertas antes **de la adjudicación de la buena pro**; la Administración podrá solicitar de los licitadores la presentación de su mejor y final oferta. El RFP debe contener los parámetros que se utilizarán para la adjudicación del contrato. Es decir, los requerimientos, los términos y las condiciones, así como los factores que han de considerarse en la evaluación para la adjudicación de la subasta. **La fase de negociación no creará un derecho adquirido entre las partes.**

Si bien este desarrollo es posterior al dictamen del 2006, el mismo no es contrario con *Tommy Muñiz v. COPAN*, supra, pues en este caso, las negociaciones no se dieron por la mera participación en un proceso de subasta, sino que surgieron a base de una expectativa real de contratar con el gobierno toda vez que hubo una adjudicación formal de la subasta.

esperaba que se le otorgaran los contratos posteriores para la implementación e instalación del producto en toda la Isla. Sin embargo, la AAA solicitó propuestas mediante el procedimiento de RFP, para la contratación posterior objeto de la reclamación del Apelado en el caso de epígrafe.[40]

Cónsono con lo anterior, los requisitos para que se configure la doctrina de *culpa in contrahendo* en el contexto de la contratación gubernamental **hay que atemperarlos a los hechos particulares del proceso de licitación y la expectativa razonable en la firma del contrato en el proceso negociación precontractual**. Esto requiere una interpretación más rigurosa, toda vez que está envuelto el desembolso de fondos públicos. *De Jesús González v. A.C.,* 148 DPR 255, 267-268 (1999).

Con estos antecedentes, concluimos igualmente que, conforme a los hechos particulares del caso, era un requisito *sine qua non* para que se configurara la doctrina de culpa *in contrahendo* que al señor Rigau se le hubiese adjudicado el RFP para que este tuviera una expectativa **real** y **razonable** en la firma del contrato con la AAA para la prestación del servicio objeto de la licitación.[41] Reiteramos que en el proceso de negociación precontractual en el contexto de la contratación gubernamental

---

[40] En cuanto al proyecto piloto, de la Transcripción de la Prueba Oral (vista celebrada el 14 de octubre de 2005), página 350 del Apéndice de la Apelación, líneas 9-11 y 18-21, surge que el señor Rigau declaró que este se realiza sin subasta y que el juez le aclaró lo siguiente:

R Como le indiqué al principio, eso son proyectos pilotos, como se..el proyecto piloto, se realiza el proyecto piloto, **no hay subasta y se paga por un servicio que aprobó.**

.........

HON. JUEZ:

**Por su cuenta y riesgo**, o algo así, **se instaló y facturó por las dos licencias, y en cuestión de adiestramiento se le pagó esa cantidad**. **Y eso no está en controversia.**

[41] Conforme a *Tommy Muñiz v. COPAN*, supra, pág. 530, se deben "considerar las circunstancias del rompimiento, específicamente: (1) el desarrollo de las negociaciones, (2) cómo comenzaron, (3) el curso que siguieron, (4) la conducta de las partes durante su transcurso, (5) la etapa en que se produjo el rompimiento, y (6) **las expectativas razonables de las partes en la conclusión del contrato,** así como cualquier otra circunstancia pertinente conforme los hechos del caso sometidos a escrutinio judicial" (Énfasis nuestro).

para el cual es necesario la celebración de una subasta formal o un RFP para contratar servicios o productos, no cabe hablar de culpa *in contrahendo* **si no se ha adjudicado la Subasta o el RFP.** Sobre estos extremos, concluimos que erró el TPI al concluir que la AAA incurrió en culpa in *contrahendo,* toda vez que el RFP para el cual el Apelado licitó **no se le adjudicó**, por lo que, como cuestión de derecho, incidió el foro primario al concluir que el señor Rigau tenía una expectativa real y razonable en la firma del contrato con la AAA para la prestación del servicio objeto de la licitación y al resolver que la AAA incurrió en *culpa in contrahendo.*[42]

Por otro lado, como **segundo y tercer señalamiento** de error, la AAA sostiene que incidió el foro *a quo* al descartar en su dictamen emitido el 6 de septiembre de 2006, las estipulaciones de hecho. A su vez, sostiene que las conclusiones de derecho son incompatibles con los hechos estipulados. Sobre estos extremos, la AAA argumenta, además, que el foro primario utilizó **prueba de referencia** como base para sostener su dictamen emitido el 6 de septiembre de 2006, que determinó que la Apelante incurrió en *culpa in contrahendo* cuando dicha prueba de referencia fue objetada durante la vista y declarada *con lugar.*

Examinado el *Informe de Conferencia con Antelación al Juicio,* destacamos que el foro primario aprobó veintitrés (23) estipulaciones de hechos acordadas por las partes y plasmadas en dicho informe, el cual precedió a la celebración del juicio que culminó con el dictamen intitulado *Sentencia Parcial* emitido en el año 2006 sobre el aspecto de la responsabilidad de la AAA. Resaltamos que, evaluado el aludido dictamen, así como la

---

[42] *Véase* Determinación de Hechos Núm. 5 de la Sentencia emitida el 10 de julio de 2024, en la que se hace constar que el RFP se les remitió a las firmas seleccionadas en el *Request for* **Qualifications** (**RFQ)** y a **Juan J. Rigau & Asociados. La cualificación de las firmas para participar en el RFP no implica la adjudicación a su favor.**

*Oposición a Recurso de Apelación* presentado ante nos por el señor Rigau, surge que, en esencia, las estipulaciones de hecho a las que alude la AAA fueron incluidas por el foro primario en el dictamen intitulado *Sentencia Parcial* emitido 6 de septiembre de 2006, con excepción de una. Advertimos que la única estipulación de hecho que no fue recogida en el mencionado dictamen fue la que estipulaba que el señor Rigau nunca negoció con Hansen Information Technologies Inc.

Ahora bien, aun cuando en esencia, el foro primario incorporó a las determinaciones de hechos del dictamen, las estipulaciones de hechos de las partes contenido en el *Informe de Conferencia con Antelación al Juicio* con excepción de una, destacamos que el foro primario incidió en sus conclusiones de derecho. Ello, al determinar que la AAA incurrió en culpa *in contrahendo* ya que, de estas determinaciones de hecho, no surge que la AAA le adjudicara al Apelado el RFP. En atención a lo anteriormente esbozado, resolvemos que las conclusiones de derecho sobre el aspecto de la responsabilidad de la AAA son incompatibles con los hechos estipulados, por lo que el foro primario incurrió en el error señalado por la AAA.[43]

Por otro lado, en lo concerniente a las objeciones de la Apelante a la prueba de referencia desfilada por el Apelado, la AAA arguye que de las doscientas tres (203) determinaciones de hechos del dictamen intitulado *Sentencia Parcial* emitido el 6 de septiembre de 2006, unas noventa (90) constituyeron prueba de referencia toda vez que expresan que un tercero manifestó algo fuera de la vista o juicio. Es la contención de la AAA que dicha prueba de referencia **fue objetada durante el juicio y declarada con lugar, por lo que debió ser excluida.**

---

[43] *Véase,* Apéndice de la Apelación, págs. 100-139.

Las comunicaciones con terceros a las que aludió el Apelado en su testimonio ante el foro primario **no están cobijadas bajo las excepciones a prueba de referencia. Tampoco surge de la Transcripción de la Prueba Oral ni del expediente que el señor Rigau hubiera anunciado a esos terceros como testigos, ni que este hubiese realizado gestiones para localizarlos o citarlos a declarar sobre el contenido del testimonio del Apelado en los que este alude a expresiones hechas por estos terceros. De igual forma, tampoco el señor Rigau estableció si dichos terceros a los que imputa crearle expectativas de que se le iba a adjudicar el RFP, estaban o no vivos o tenían impedimentos para declarar o acudir al tribunal, ni que dichos terceros estuviesen cobijados por algún privilegio.**

Durante el examen directo al Apelado, su abogada le preguntó si el Ing. José E. Calderón, Presidente del Comité Técnico Evaluador que rendiría el Informe, le había hecho algún comentario sobre cuando se iba a comenzar a instalar el sistema por el licitador agraciado. **Dicha pregunta fue objetada por ser prueba de referencia** y la objeción fue declarada *Ha Lugar* por el foro primario por ese fundamento.[44] El Apelado solicitó reconsideración e intentó convencer al foro *a quo* de que la pregunta procedía porque la expresión del tercero, el Ing. José E. Calderón, construiría una admisión de parte por ser compañero de la AAA. El foro *a quo* le expresó claramente que no había ningún documento que recogiera la aludida admisión.[45] Es preciso destacar que el presidente del Comité Evaluador, el Ing. José A. Calderón, **era funcionario de PSG**.[46]

---

[44] *Íd.*, págs. 408-411.
[45] *Íd.*, pág. 412.
[46] Véase, Determinación de Hecho Núm. 11 de la *Sentencia* apelada, emitida el 10 de julio de 2024, *Íd.*, pág. 6.

Toda vez que dicha prueba de referencia fue objetada por la AAA durante el juicio y **declarada *con lugar***, es forzoso concluir que esta debió ser excluida.[47] En consecuencia**, advertimos que el** foro primario **incidió al descansar en prueba de referencia objetada para concluir como cuestión de derecho, a base de prueba inadmisible**, **que el señor Rigau tenía una expectativa de que el RFP se le iba a adjudicar por expresiones de terceros que no estaban sujetos a ser contrainterrogados y al resolver a base de dichas expresiones de terceros que la Apelante incurrió en mala fe constitutiva de culpa *in contrahendo*.**

Sobre estos extremos, resolvemos, además, que las determinaciones de hecho número 199 y 200 del dictamen de 6 de septiembre de 2006, intitulado *Sentencia Parcial,* que determinan AAA **y PSG no actuaron de buena fe durante las negociaciones y que ambas le crearon una falsa expectativa al Apelado de que el contrato era de él**, **no encuentra apoyo en la prueba desfilada**, **toda vez que está sustentada en prueba de referencia inadmisible**.

De igual forma, aun adjudicándole credibilidad al testimonio del señor Rigau, este es insuficiente para probar mala fe en las negociaciones por parte de la AAA. De este modo tampoco encuentra apoyo en la prueba desfilada la determinación de hecho núm. 201 de del referido dictamen emitido en el 2006, en la que el foro *a quo* determinó que la AAA y PSG no tenían la intención real de culminar las negociaciones con el otorgamiento del contrato y posterior implementación del sistema.

**Como cuarto señalamiento de error la Apelante sostiene que erró el foro primario** en su evaluación y determinación de los daños económicos concedidos a la parte demandante-apelada bajo

---

[47] *Íd.*, págs. 408-412.

la doctrina de *culpa in contrahendo* en la Sentencia emitida el 10 de julio de 2024. Razona la AAA que el análisis al que adviene el TPI es contrario a las directrices de la *Resolución y Orden* del 6 de diciembre de 2017, la cual constituía la "ley del caso", así como por ser igualmente contrario al derecho aplicable.

**Como cuestión de umbral enfatizamos que este Tribunal de Apelaciones concluye que no se configuró la culpa *in contrahendo* por parte de la AAA, por lo que nuestra adjudicación sobre esos extremos dispone del caso ante nuestra consideración. No obstante, conviene aclarar que en el caso que nos ocupa no es de aplicación la doctrina de la ley del caso, toda vez que no se cumplen los requisitos establecidos por nuestro ordenamiento para ello.**

La *Resolución* y *Orden* a la que alude la AAA como ley del caso, emitida el 6 de diciembre de 2017, es una resolución interlocutoria emitida en esa fecha por el foro primario, que a su vez el foro primario, en su *Sentencia* de 10 de junio de 2024, utiliza como guía para la determinación de los daños bajo la doctrina de *culpa in contrahendo*.[48] En esta, el foro primario concluyó que bajo la doctrina de *culpa in contrahendo* únicamente procedía recobrar los gastos relacionados con la fase preparatoria del acuerdo. Sin embargo, en lo pertinente al planteamiento de que dicha resolución interlocutoria constituye ley del caso destacamos que un Panel Hermano de este Tribunal de Apelaciones denegó la solicitud de *certiorari* presentada en aquella ocasión por el Apelado para revisarla, por lo que **rehusó intervenir en los méritos de dicho dictamen interlocutorio.** Con estos antecedentes precisa aclarar que toda vez que este Tribunal de Apelaciones no entró en los méritos de la solicitud de *certiorari*, el dictamen interlocutorio de 6

---

[48] *Íd.*, págs. 1065-1072.

de diciembre de 2017 carecía de la finalidad establecida por un tribunal de mayor jerarquía el cual es un requisito necesario para que sea de aplicación la doctrina de la ley del caso.

Como **quinto señalamiento** de error la AAA sostiene que incidió el foro primario al no deducir y tampoco considerar en su evaluación y en su consecuente determinación de los daños en la sentencia del 10 de julio de 2024, el dinero del *grant* de PRIDCO al Apelado por la suma de quinientos mil dólares ($500,000.00) recibido por el señor Rigau durante el periodo de enero de 1997 a diciembre de 1998. Razona la AAA que dicha deuda que le fue condonada y que el Apelado utilizó dicha suma para pagar su operación y pagarles a contratistas, por lo que no procedía su reclamo de que realizaron trabajos en "preparación" para implementar el contrato con la AAA.

De la prueba oral desfilada y creída por el foro primario surge que la señora Irma Rigau declaró que el préstamo de PRIDCO al que alude la AAA en su quinto señalamiento de error, fue pagado en su totalidad, por lo que, en ausencia de otra prueba, no intervendremos con la apreciación que el TPI le dio a dicho testimonio.[49]

Como **sexto señalamiento** de error la AAA arguye que incidió además, el foro primario en su sentencia de 10 de julio de 2024, al concederle entera credibilidad y validez a los testimonios del señor Rigau y el de su hija y contable Irma Rigau al sostener que todos los gastos de nómina y pagos y reembolsos a sus empleados y contratistas para el periodo de expectativa entre enero 1997 y diciembre 1998 concernían exclusivamente al proyecto de la AAA, cuando los cheques presentados no identificaban el proyecto para el cual trabajaron esas personas y **cuando del informe y el testimonio del perito de la AAA, Dr. Ramón Cao,**

---

[49] *Íd.*, pág. 1647.

éste pudo identificar ingreso bruto del Apelado por otros asuntos no relacionados con la AAA durante dicho periodo.

Independientemente de la credibilidad adjudicada a los testimonios del señor Rigau y al de su hija Irma Rigau, en cuanto a que estos aseguraron que todos los gastos de nómina, pagos y reembolsos a sus empleados para el periodo de expectativa de contrato entre enero de 1997 y diciembre de 1998 correspondían exclusivamente al proyecto de la AAA, los cheques presentados no identificaban el proyecto para el cual presuntamente trabajaron esas personas. Además, existe otra prueba en el récord de índole pericial en la que el perito de la AAA pudo identificar ingreso bruto devengado por el señor Rigau por otros asuntos no relacionados con la AAA durante dicho término mediante el testimonio e informe del perito economista, Dr. Ramón Cao, el cual fue admitido en evidencia. Según se desprende del Informe del Dr. Ramón Cao, perito economista de la AAA, durante el periodo aludido por el Apelado y su hija en su testimonio, el señor Rigau tuvo ingresos netos brutos de novecientos mil dólares ($900,000.00) para los años 1997 y 1998.[50] Del mismo modo, el testimonio directo del Dr. Ramón Cao confirma lo expuesto en su informe pericial.[51]

En lo pertinente a la cuantía de daños reclamada por el Apelado y concedida por el TPI en su dictamen de 10 de julio de 2024, aunque coincidimos con la postura de la AAA en su sexto señalamiento de error en cuanto a su contención de que el foro primario debió atribuir mayor valor probatorio a la prueba pericial desfilada, nuestro razonamiento inicial sobre la controversia de responsabilidad si alguna, de la AAA, dispone del caso ante nuestra consideración.

---

[50] Véase, Tabla, en el *Informe Pericial* del Dr. Ramón Cao, perito economista de la AAA, *Íd.*, págs. 2137-2142.
[51] *Íd.*, págs. 2067-2068.

Reiteramos que como bien resolvimos en la discusión de los anteriores señalamientos de error, en el caso de epígrafe hay ausencia de responsabilidad por parte de la AAA por los daños precontractuales alegados por el Apelado al no otorgársele el contrato objeto del RFP. La culpa *in contrahendo* en la que el señor Rigau sostuvo su reclamo contra la Apelante no se configuró en este caso, ante la ausencia de adjudicación del RFP a favor del Apelado. La AAA no es responsable de los daños precontractuales reclamados por el señor Rigau por los gastos incurridos por este en la fase preparatoria a la adjudicación del RFP. La expectativa del Apelado en que se le adjudicara el RFP y en que se firmara el contrato, no fue una expectativa real y razonable toda vez que además de que había otros proponentes cualificados, el señor Rigau nunca recibió notificación escrita de que se le hubiera adjudicado el RFP.

Con estos antecedentes, concluimos que procede revocar la Sentencia emitida por el foro primario en contra de la AAA, que impuso a la Apelante responsabilidad por los daños precontractuales reclamados por el señor Rigau.

**IV.**

Por los fundamentos anteriormente expuestos, los cuales hacemos formar parte de esta Sentencia, **revocamos** la *Sentencia* apelada emitida por el foro primario.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones